Todd M. Schneider (SBN 158253)
James A. Bloom (SBN 311051)
Kyle G. Bates (SBN 299114)
SCHNEIDER WALLACE
COTTRELL KONECKY
WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
jbloom@schneiderwallace.com
kbates@schneiderwallace.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL F. DORMAN; individually as a participant in the SCHWABPLAN RETIREMENT SAVINGS AND INVESTMENT PLAN and on behalf of a class of all those similarly situated, | Case No.: 4:17-CV-00285 (CW) |
| | **FIRST AMENDED COMPLAINT** |
| Plaintiff, | **CLASS ACTION (ERISA)** |
| v. | |
| THE CHARLES SCHWAB CORPORATION; CHARLES SCHWAB & CO INC.; SCHWAB RETIREMENT PLAN SERVICES INC.; CHARLES SCHWAB BANK; CHARLES SCHWAB INVESTMENT MANAGEMENT, INC.; WALTER W. BETTINGER; III; CHARLES R. SCHWAB; JOSEPH R. MARTINETTO; MARTHA TUMA; JAY ALLEN; DAVE CALLAHAN; C. DAWN RORIG; JOHN C. CARK; JOHN DOES 1-50; and XYZ CORPORATIONS 1-5, | |
| Defendants. | |

# I. NATURE OF THE ACTION

1.     The Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA") imposes strict fiduciary duties of prudence and loyalty on fiduciaries for ERISA covered retirement plans. ERISA § 404(a)(1), *codified at* 29 U.S.C. § 1104(a)(1). These duties, which require fiduciaries to act "solely in the interest of [plan] participants and beneficiaries," ERISA § 404(a)(1), are "the highest known to law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996).

2.     Plaintiff Michael F. Dorman brings this action pursuant to Sections 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3). Plaintiff brings this action on behalf of the SchwabPlan Retirement Savings and Investment Plan (the "Plan") to obtain the relief provided under ERISA § 409, 29 U.S.C. § 1109, for losses suffered by the Plan resulting from the Defendants' fiduciary breaches and prohibited transactions described herein and for other appropriate equitable and injunctive relief under ERISA § 502(a)(3). Plaintiff brings this action on behalf of a class of similarly situated participants in and beneficiaries of the Plan.

3.     The claims asserted herein arise from Defendants' imprudent and disloyal exercise of their discretionary fiduciary authority over the Plan to include Defendants' own affiliated investment products as investment options within the Plan and sale of their own services to the Plan. Defendants thereby reaped significant fees and profits at the expense of the Plan and its participants, including the Plaintiff. As a result, Defendants violated their ERISA fiduciary duties of prudence and loyalty, violated their co-fiduciary duties, and engaged in transactions prohibited by ERISA § 406(a) and (b). In addition, Defendants knowingly participated in and/or knowingly received the benefits from the fiduciary and co-fiduciary breaches and prohibited transactions

caused by the other defendants.

## II. PARTIES AND THE PLAN

**A.     Defendants**

4.      Defendant the Charles Schwab Corporation ("CSC") is a Delaware corporation with its principal place of business in San Francisco, California.

5.      Defendant Charles Schwab & Co. Inc. ("CS&Co") is a California corporation with its principal place of business in San Francisco, California. CS&Co is a wholly owned subsidiary of Defendant CSC.

6.      Defendant Charles Schwab Investment Management, Inc. ("CSIM") is a Delaware corporation with its principal place of business in San Francisco, California. CSIM is a wholly owned subsidiary of Defendant CSC.

7.      Defendant Schwab Retirement Plan Services, Inc. ("SRPS") is an Ohio corporation with its principal place of business in Richfield, Ohio. SRPS is a wholly owned subsidiary of Defendant CSC.

8.      Defendant Charles Schwab Bank ("CSBank") is a federal savings association with its principal office in Reno, Nevada. CSBank is a wholly owned subsidiary of Defendant CSC.

9.      Defendant Walter W. Bettinger, III ("Bettinger") is a member of the Board of Directors of CS&Co. On information and belief, Defendant Bettinger is a citizen and resident of California.

10.     Defendant Charles R. Schwab ("Charles R. Schwab") is a member of the Board of Directors of CS&Co. On information and belief, Defendant Charles R. Schwab is a citizen and resident of California.

11.     Defendant Joseph R. Martinetto ("Martinetto") is a member of the Board of

Directors of CS&Co. On information and belief, Defendant Martinetto is a citizen and resident of California.

12.     Defendants John Does 1-5 are the remaining members of the Board of Directors of CS&Co during the Class Period.

13.     Collectively, Defendants Bettinger, Charles R. Schwab, Martinetto and John Does 1-5 are referred to herein as the "Board of Director Defendants."

14.     On information and belief, Defendant Martha Tuma ("Tuma") was a member of the Employee Benefits Administrative Committee (the "Committee") during the Class Period. On information and belief, Defendant Tuma is a citizen and resident of California.

15.     On information and belief, Defendant Jay Allen ("Allen") was a member of the Committee during the Class Period. On information and belief, Defendant Allen is a citizen and resident of California.

16.     On information and belief, Defendant Dave Callahan ("Callahan") was a member of the Committee during the Class Period. On information and belief, Defendant Callahan is a citizen and resident of California.

17.     On information and belief, Defendant C. Dawn Rorig ("Rorig") was a member of the Committee during the Class Period. On information and belief, Defendant Rorig is a citizen and resident of California.

18.     On information and belief, Defendant John C. Clark ("Clark") was a member of the Committee during the Class Period. On information and belief, Defendant Clark is a citizen and resident of California.

19.     Defendants John Does 6-25 are the remaining members of the Committee during the Class Period.

20.     Collectively, Defendants Tuma, Allen, Callahan, Rorig, Clark and John Does 6-25 are referred to herein as the "Committee Defendants."

21.     Defendants John Does 26-50 and XYZ Corporations 1-5 are any other individuals and entities that were named fiduciaries for the Plan within the meaning of ERISA § 402(a), de facto fiduciaries for the Plan within the meaning of ERISA § 3(21)(A), or who knowingly participated in or received a benefit from the fiduciary breaches and prohibited transactions described herein and who therefore must disgorge any property in their possession that in good conscience belongs to the Plan pursuant to ERISA § 502(a)(3).

22.     Plaintiff has been unable to identify the individuals and entities named as John Does 1-50 and XYZ Corporations 1-5. Plaintiff will endeavor to identify those individuals and entities in discovery and will seek leave to amend the complaint to name them once their identities have been ascertained.

23.     Collectively, CS&Co., CSC, SRPS, CSBank, CSIM, the Committee Defendants, and John Does 26-50 and XYZ Corporations 1-5 are referred to herein as the "Schwab Fiduciary Defendants."

24.     Collectively, CS&Co., CSC, SRPS, CSBank, CSIM are referred to herein as the "Schwab Entity Defendants."

**B.   The Plan**

25.     The Plan is an "employee pension benefit plan" pursuant to ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) that is designed to provide retirement income to Defendants' employees who participate in the Plan. In addition, the Plan is a "defined contribution plan" and an "individual account plan" which provides retirement benefits "based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses… which may be allocated

to such participant's account." ERISA § 3(34), 29 USC § 1002(34). Thus unlike traditional defined benefit pensions, in a defined contribution plan like the Plan, the amount of retirement savings that participants (such as Plaintiff) receive at retirement is simply a matter of how much is in their individual accounts at the time—contributions, less fees, plus any investment returns. The Plan allows participants to have a portion of their wages contributed to the plan on their behalf and to receive matching employer contributions.

26.     The Plan covers all eligible employees of Defendant CSC and participating affiliates of CSC.

27.     At all relevant times, Defendant CSC has been the sponsor of the Plan within the meaning of ERISA § 3(16)(B).

28.     At all relevant times, Defendant CS&Co has been the Plan Administrator for the Plan within the meaning of ERISA § 3(16)(A).

29.     Pursuant to the Plan, Defendant CS&Co fulfilled its administrative functions through the Committee.

30.     Defendant CS&Co and the Committee Defendants administered the Plan at Defendant CSC's offices in San Francisco, California.

31.     Defendant CS&Co., through the Board of Director Defendants, appointed the members of the Committee, including the Committee Defendants.

32.     Pursuant to the Plan, the Committee Defendants were required to periodically report to the Board of Director Defendants with respect to the Committee's administrative functions under the Plan.

33.     The Plan also expressly gave the Board of Director Defendants the authority to remove any members of the Committee at any time.

34.     The Plan's governing documents specify that Defendant CS&Co is a named fiduciary of the Plan for purposes of ERISA § 402(a), as is any "participating employer" whose employees participate in the Plan. On information and belief, Defendants CSC, SRPS, CSBank and CSIM are also "participating employers" for purposes of the Plan, and are thus also named fiduciaries for the Plan pursuant to ERISA § 402(a).

35.     Defendant CS&Co and the Committee Defendants retained the Charles Schwab Trust Company to serve as the trustee for the Plan. In 2008, the Charles Schwab Trust Company was merged into Defendant CSBank, which became the Plan's trustee by operation of the merger. Defendant CSBank has served as the Plan's trustee during the remainder of the Class Period, a service which it provides through its Business Trust Division.

36.     Defendant CS&Co and the Committee Defendants retained Defendant SRPS to provide recordkeeping and related services to the Plan, services which Defendant SRPS has in fact provided at all relevant times.

**C.     Plaintiff**

37.     Plaintiff Michael F. Dorman is a citizen and resident of New Jersey and is a participant, within the meaning of ERISA § 3(7), in the Plan.

### III. JURISDICTION AND VENUE

38.     Plaintiff brings this action pursuant to ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3). This Court has subject matter jurisdiction over Plaintiff's claims pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

39.     Venue lies in the Northern District of California pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because several Defendants reside within or may be found in this district,

the Plan is administered in this district, and/or the alleged breaches of the duties imposed by ERISA took place in this district.

40.     The Court has general personal jurisdiction over Defendants CSC, CS&Co. and CSIM because they are incorporated or organized in California and/or have their principal places of business within this district.

41.     The Court has general personal jurisdiction over the Board of Director Defendants and the Committee Defendants because, on information and belief, they reside in and are citizens of California.

42.     The Court has specific personal jurisdiction over all Defendants because they provided services for the Plan in this district and/or they engaged in the conduct described herein which took place in and/or was specifically directed towards this district.

## IV. FACTUAL ALLEGATIONS

43.     In defined contribution plans, employees' benefits at retirement "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015). Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire.

44.     Over time, even small differences in fees and performance compound and can result in vast differences in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble*, 135 S. Ct. at 1825.

45.    A 2009 study by the Government Accountability Office found that "even a seemingly small fee can have a large negative effect on savings in the long run. As shown in figure 1 [included below], an additional 1 percent annual charge for fees would significantly reduce an account balance at retirement."



**Figure 1: Effect of 1-Percentage Point Higher Annual Fee on a $20,000 DC Plan Balance Invested over 20 Years**

Government Accountability Office, 401(K) PLANS Several Factors Can Diminish Retirement Savings, but Automatic Enrollment Shows Promise for Increasing Participation and Savings, No. 10-153T.

*The Schwab Affiliated Products and Services.*

46.    The Schwab Fiduciary Defendants had a fiduciary obligation to prudently and loyally select the investment options that would be available to the Plan's participants. That obligation required the Schwab Fiduciary Defendants to carefully, skillfully, prudently and diligently investigate the different investment options that they could include, and to select the best and most cost-effective options available. In so doing, they were required to act solely in the interests of the participants and beneficiaries, and chose investment options for the exclusive purpose of providing benefits to the participants and beneficiaries.

47.     But instead of managing the Plan solely in the interests of its participants and beneficiaries by carefully and prudently selecting the best and most cost-effective investment options available, the Schwab Fiduciary Defendants imprudently and disloyally larded the Plan with unnecessary, expensive and poorly performing investment products and services offered and managed by the Schwab Entity Defendants and their affiliates and which paid fees to the Schwab Entity Defendants – the "Schwab Affiliated Products and Services." The Schwab Fiduciary Defendants included the Schwab Affiliated Products and Services in the Plan in breach of their fiduciary duties of prudence and loyalty.

48.     At issue in this case are several types of Schwab Affiliated Products and Services, categorized here for ease of reference as: (1) the "Affiliated Funds," (2) the "Schwab Savings Account," (3) the "Self-Directed Brokerage," and (4) the "Interest Free Loan from Unallocated Plan Cash."

49.     On information and belief, the Schwab Fiduciary Defendants made no meaningful investigation into whether these Schwab Affiliated Products and Services were prudent for the Plan, or whether alternative funds offered by other providers would be more appropriate, cost effective or better performing. Instead, the Schwab Fiduciary Defendants imprudently and disloyally elected to provide the Schwab Affiliated Products and Services to the Plan in an effort to generate fees for the Schwab Entity Defendants at the expense of the Plan and its participants.

50.     Moreover, not only were the Schwab Affiliated Products and Services unreasonable and unnecessary for purposes of prudently administering the Plan, but the fees collected by the Schwab Entity Defendants from the Plan for the Schwab Affiliated Products and Services were excessive, unreasonable and far exceeded the real costs associated with administering the Plan.

*1. The Affiliated Funds.*

51.     Despite the fact that they were more expensive than comparable alternatives available in the market, and despite the fact that they performed no better or even, sometimes, worse than market peers, the Schwab Fiduciary Defendants included funds managed by the Schwab Entity Defendants or their affiliates (the "Schwab Affiliated Funds") as investment options within the Plan.

52.     For example, throughout the Class Period, the Schwab Fiduciary Defendants included the Schwab S&P 500 Index Fund as an investment option in the Plan. The Schwab S&P 500 Index Fund is distributed by Defendant CS&Co the investment advisor is Defendant CSIM – thus the Schwab S&P 500 Index Fund is a "Schwab Affiliated Fund."

53.     But other companies besides Schwab offer comparable passively managed S&P 500 index funds, and several of those funds offer S&P 500 index funds with lower fees and with less tracking error than Schwab's fund compared to the S&P 500 index itself. For example:

**Table 1**

| S&P 500 Index Funds in 2011 | | | | |
|---|---|---|---|---|
| **Fund** | **Ticker** | **2011 Expense Ratio** | **Tracking Error – 2010** | **Average Tracking Error – 2008-2010** |
| Fidelity Spartan 500 Index Fund, I | FXSIX | 0.05% | 0.05% | -0.01% * |
| *Schwab S&P 500 Index Fund* | *SWPPX* | *0.09%* | *0.09%* | *0.01%* |
| Vanguard 500 Index Fund Admiral Class | VFIAX | 0.06% | 0.01% | -0.06% * |
| Vanguard Institutional Index Fund, I | VINIX | 0.04% | 0.01% | -0.07% * |

* The negative tracking error indicates that the all of these funds (except the Schwab S&P 500 Index Fund) outperformed the S&P 500 index over the period from 2008 – 2010.

54.     A prudent fiduciary investigation into which of the available S&P 500 index funds to include certainly would have examined facts including the funds' fees and tracking error. Had the Schwab Fiduciary Defendants included any of the other funds identified on Table 1 as

investment options for the Plan in lieu of the Schwab S&P 500 Index Fund, it would have cost the Plan's participants less to invest in a fund with a better recent history relative to their common benchmark, the S&P 500 index.

55.     While the 3 to 5 basis point difference in fees between the Schwab S&P 500 Index Fund and the other funds listed in Table 1 may seem small at first glance, the Plan had more than $100 million invested in the Schwab S&P 500 Index Fund each year during the Class Period, meaning that the Plan paid hundreds of thousands of dollars in fees more to Schwab than it would have paid to the other fund providers listed above even when not compounded.

56.     Since 2011, the fees for Schwab's S&P 500 Index Fund have remained the same, while the fees for many of their competitors' S&P 500 index funds, such as the Fidelity Spartan 500 Index Fund I, have declined. In addition, other new S&P 500 index funds are now offered with lower fees than charged by the Schwab S&P 500 Index Fund. Thus by 2015, numerous S&P 500 index funds with lower costs and better performance than the Schwab S&P 500 Index Fund were available on the market:

**Table 2**

| S&P 500 Index Funds at 12/31/2015 | | | | |
|---|---|---|---|---|
| **Fund** | **Ticker** | **2015 Expense Ratio** | **Tracking Error – 2015** | **Average Tracking Error – 2013-2015** |
| DFA US Large Company | DFUSX | 0.08% | 0.00% | 0.07% |
| Fidelity Spartan 500 Index Fund, I | FXSIX | 0.035% | 0.00% | 0.03% |
| State Street Equity 500 Index Fund - Class K | SSSYX | 0.06% | 0.13% | ** |
| *Schwab S&P 500 Index Fund* | *SWPPX* | *0.09%* | *0.09%* | *0.11%* |
| Vanguard 500 Index Fund Admiral Class | VFIAX | 0.06% | 0.02% | 0.04% |
| Vanguard Institutional Index Fund, I | VINIX | 0.04% | 0.01% | 0.03% |

** Fund was launched during period.

57.     But throughout the Class Period, the Schwab Fiduciary Defendants included the Schwab S&P 500 Index Fund as an investment option in the Plan even though other comparable S&P 500 index funds were available with expenses that were comparable or lower, and in some cases half as much or less. Nor did the Schwab Fiduciary Defendants include any of the other available S&P 500 index funds with lower fees and better performance as investment options in addition to the Schwab S&P 500 Index Fund.

58.     But the Schwab S&P 500 Index Fund wasn't the only Schwab Affiliated Fund that the Schwab Fiduciary Defendants included as an investment option in the Plan. During the Class Period, the Schwab Fiduciary Defendants also included seven other Schwab mutual funds, ten Schwab "target date" funds, a Schwab stable value fund, a Schwab money market fund, and a Schwab savings account as investment options (the stable value fund, money market fund, and savings account are discussed in more detail herein).

59.     Like the Schwab S&P 500 Index Fund, many of the other Schwab Affiliated Funds had higher fees and worse performance than comparable funds from other providers. By the year end 2015, over $500 million in Plan assets were invested in these Schwab Affiliated Funds.

60.     For example, the Schwab International Index Fund had fees of 19 basis points in 2011. Other companies offered international index funds with substantially similar benchmarks, investment mandates and performance but lower fees, such as the Fidelity International Index Fund (fees of 10 basis points) and the Vanguard Developed Markets Index Fund (13 basis points). Similarly, the Schwab Small Cap Index Fund had fees of 19 basis points in 2011, but other, less expensive small cap index funds were available in the market including the Vanguard Small Cap Index (10 basis points).

61.     In addition, the "target date" funds offered by Schwab, called the "Schwab Target

Date Funds," were far more expensive than comparable target date funds available on the market, and from 2008-2011, underperformed than their peers. For example, the Schwab Managed Retirement Trust Funds cost significantly more than the comparable passive target date funds offered by Vanguard (the "Vanguard Target Retirement Funds"), but on average performed much worse than the Vanguard funds between 2008-2011:

**Table 3**

| Target Date Fund – Target Retirement Year | Schwab Target Date Fund Fee | Vanguard Target Date Fund Fee | Vanguard Target Date Fund Average Annualized Overperformance vs. Schwab Target Date Fund, 2008-2011 |
|---|---|---|---|
| 2010 | 0.45% | 0.14% | 0.42% |
| 2015 | 0.45% | 0.14% | 0.30% |
| 2020 | 0.45% | 0.14% | 0.31% |
| 2025 | 0.45% | 0.15% | 0.22% |
| 2030 | 0.45% | 0.15% | 0.26% |
| 2035 | 0.45% | 0.15% | 0.06% |
| 2040 | 0.45% | 0.16% | 0.44% |
| 2045 | 0.45% | 0.16% | 0.27% |
| 2050 | 0.45% | 0.16% | 0.41% |
| Income Fund | 0.45% | 0.14% | 0.40% |

62.    Defendant CSBank served as the trustee for the Schwab Target Date Funds, and the many of the funds that the Schwab Target Date Funds were invested in were also managed by Schwab affiliates, meaning that the Schwab Entity Defendants received revenue from the Plan because the Plan included the Schwab Target Date Funds as investment options.

63.    Any reasonably prudent fiduciary investigating whether to include the Schwab Target Date Funds or target date funds from another provider, such as the Vanguard Target Retirement Funds, would have compared the relative fees and performance of those funds during

the preceding years. As Table 3 reflects, the Vanguard Target Retirement Funds had fees more than 80% lower than the Schwab Target Date Funds, and materially outperformed the Schwab Target Date Funds during the years leading up to the start of the Class Period. Yet the Schwab Fiduciary Defendants continued to include the Schwab Target Date Funds as investment options until 2014, by which time the Plan had more than $200 million invested in the Schwab Target Date Funds.

64.     No prudent or loyal fiduciary who performed a reasonably thorough investigation would have included the Schwab Affiliated Funds such as the Schwab S&P 500 Index Fund, the Schwab International Index Fund, the Schwab Small Cap Index Fund, the other Schwab mutual funds, or the Schwab Target Date Funds during the Class Period when other comparable funds with the same objective, lower fees and better performance were available. On information and belief, the Schwab Fiduciary Defendants made no thorough investigation into whether other, less expensive, better performing funds might be a better fit for the Plan's participants, either at the time each Affiliated Fund was added as an investment option or on an ongoing basis as part of periodic review of the Plan's portfolio. Instead, on information and belief, the Schwab Fiduciary Defendants included the Schwab Affiliated Funds for no other reason than to generate fees for the Schwab Entity Defendants at the expense of the Plan's participants. The Schwab Fiduciary Defendants therefore violated the duties of prudence and loyalty set forth in ERISA § 404(a)(1).

65.     The Schwab Fiduciary Defendants' inclusion of and failure to remove the Affiliated Funds in the Plan also amounted to prohibited transactions within the meaning of ERISA § 406(a) and (b).

a.     Defendants CSC, CS&Co., SRPS and CSIM are all parties in interest with respect to the plan under ERISA § 3(14), and the inclusion of and failure to remove the Self-

Directed Brokerage amounted to the "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

b.      Moreover, the Schwab Fiduciary Defendants' inclusion of and failure to remove the Schwab Affiliated Funds from the Plan resulted from the Schwab Fiduciary Defendants "deal[ing] with the assets of the plan in [their] own interest or for [their] own account" in violation of ERISA § 406(b)(1), "act[ing] in any transaction involving the plan on behalf of a party … whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries" in violation of ERISA § 406(b)(2), and "receiv[ing] any consideration for [their] own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan" in violation of ERISA § 406(b)(3).

***2. Schwab Savings Account.***

66.      Until April 30, 2012, the Schwab Fiduciary Defendants included a collective trust called the Schwab Stable Value Fund as a Plan investment option. The Schwab Stable Value Fund was managed by Defendant CSBank, which collected fees of 0.4% annually, until the fund was terminated and liquidated effective April 30, 2012.

67.      At year-end 2011, the Plan had more than $135 million invested in the Schwab Stable Value Fund.

68.      After the Schwab Stable Value Fund closed on April 30, 2012, until sometime in 2014, the Schwab Fiduciary Defendants included the Schwab Value Advantage Money Fund as an investment option in the Plan in lieu of the Schwab Stable Value Fund.

69.      The Schwab Value Advantage Money Fund is managed by Defendant CSIM, which collects fees from the fund for that management.

70.     In 2014, the Schwab Fiduciary Defendants replaced the Stable Advantage Money Fund with a Schwab Bank Savings Cash account (the "Schwab Savings Account") as an investment option in the Plan. The Schwab Savings Account is a demand deposit account at Defendant CSBank that pays accountholders interest equivalent to money market rates.

71.     As such, prior to 2012 the only stable value fund available to Plan participants was Schwab's own Schwab Stable Value Fund, and since that time, no stable value fund has been available at all.

72.     Stable value funds are a common investment in large defined contribution plans like the Plan—and they in fact are designed specifically for use in such plans. Stable value funds are conservatively managed to preserve principal and provide a stable credit rate of interest. And "[b]ecause they hold longer-duration instruments, [stable value funds] generally outperform money market funds, which invest exclusively in short-term securities." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); *see also* Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between. Stable Value and Money Market*, 39 AKRON L. REV. 9, 24 (2006) (In contrast to money market funds, stable value funds "can invest in longer-term financial instruments", and thus, "Stable Value Funds simply outperform Money Market Funds.").

73.     In addition to longer duration instruments generating excess returns over money market investments, stable value funds provide a guaranteed rate of return to the investor, referred to as a crediting rate, and protect against the loss of principal and accrued interest. This protection is provided through a wrap contract issued by a bank, insurance company or other financial institution that guarantees the book value of the participant's investment.

74.     According to the 2015 Stable Value Study published by MetLife, over 80% of plan

sponsors offer a stable value fund. MetLife, 2015 Stable Value Study: A Survey of Plan Sponsors, Stable Value Fund Providers and Advisors at 5 (2015). The study also notes that stable value returns were "more than double" the returns of money market funds from 1988 to 2015, and 100% of stable value providers and almost 90% of financial advisors to defined contribution plans "agree that stable value returns have outperformed money market returns over the last 25 years." *Id.* at 7 (emphasis added).

75.     Numerous stable value funds are available in the marketplace from a variety of providers.

76.     The Hueler Index published by Hueler Analytics is the industry standard for reporting returns of stable value funds, and its index includes data on numerous stable value funds with assets under management exceeding $100 billion. The Hueler Index average thus represents a reasonable estimate of the average returns of a typical stable value fund.

77.     The average stable value returns as reflected in the Hueler index have far exceeded the returns of the Schwab Savings Account or the Schwab Value Advantage Money Fund:

**Table 4**

|  | Year | Return | Hueler Index Average Return | Schwab Affiliated Option Underperformance |
|---|---|---|---|---|
| Schwab Value Advantage Money Fund | 2012 | 0.01% | 2.26% | 2.25% |
|  | 2013 | 0.01% | 1.84% | 1.83% |
|  |  |  |  |  |
| Schwab Savings Account | 2014 | 0.15% | 1.69% | 1.54% |
|  | 2015 | 0.13% | 1.77% | 1.64% |

78.     To put the dismal return numbers for the Schwab Value Advantage Money Fund and Schwab Savings Account into perspective, inflation in the United States averaged 1.24%

annually from April, 2012 (when the Value Advantage Money Fund was first offered in the Plan) until year end 2015. The Schwab Value Advantage Money Fund and Schwab Savings Account together yielded less than 0.08% over that same period on an annual basis. Thus participants effectively lost more than 1% per year simply by investing money in the Schwab Value Advantage Money Fund or Schwab Savings Account. Of course, had Plan participants been offered the option to invest in a stable value fund, not only would they have been able to keep pace with inflation, but they would have been able to obtain a return considerably above inflation over that period.

79.     Schwab, on the other hand, benefited by including the Schwab Value Advantage Money Fund and Schwab Savings Account in the Plan in at several ways:

a.      Schwab's affiliates – Defendant CSB for the Schwab Stable Value Fund and Defendant CSIM for the Schwab Value Advantage Money Fund – collected management fees from the Plan's money invested in those options.

b.      The additional assets in the Schwab Savings Account, like all savings accounts, provided additional capital to Defendant CSB, allowing it to lend and invest more and make additional profits. Defendant CSB kept the difference, or spread, between the yield it returned to the holders of the Schwab Savings Account and what it made for itself lending and investing the additional funds to which the Schwab Savings Account gave it access.

80.     On information and belief, the Schwab Fiduciary Defendants made no meaningful investigation into the merits of including a higher yielding stable value fund offered by another company in lieu of or in addition to the Schwab Stable Value Fund, the Schwab Value Advantage Money Fund, or the Schwab Savings Account, either at the time those investment options were added or on an ongoing basis as part of periodic review of the Plan's portfolio. The Schwab

Fiduciary Defendants' obligation to undertake that investigation was magnified by the obviously low returns the Schwab products that were included were providing to investors. Instead, on information and belief, the Schwab Fiduciary Defendants included the Schwab Stable Value Fund, the Schwab Value Advantage Money Fund and the Schwab Savings Account in lieu of stable value funds offered by other providers for no other reason than to generate fees for the Schwab Entity Defendants at the expense of the Plan's participants. Schwab Fiduciary Defendants therefore violated the duties of prudence and loyalty set forth in ERISA § 404(a)(1).

81.    The Schwab Fiduciary Defendants' inclusion of and failure to remove the Schwab Stable Value Fund, the Schwab Value Advantage Money Fund and the Schwab Savings Account in the Plan also amounted to prohibited transactions within the meaning of ERISA § 406(a) and (b).

a.    CSC, CSBank and CSIM are all parties in interest with respect to the plan under ERISA § 3(14), and the inclusion of and failure to remove the Schwab Stable Value Fund, the Schwab Value Advantage Money Fund and the Schwab Savings Account amounted to the "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

b.    Moreover, Defendants' inclusion of and failure to remove the Schwab Stable Value Fund, the Schwab Value Advantage Money Fund and the Schwab Savings Account in the Plan resulted from the Defendants "deal[ing] with the assets of the plan in [their] own interest or for [their] own account" in violation of ERISA § 406(b)(1), "act[ing] in any transaction involving the plan on behalf of a party … whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries" in violation of ERISA § 406(b)(2), and

"receiv[ing] any consideration for [their] own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan" in violation of ERISA § 406(b)(3).

### 3. Self-Directed Brokerage.

82.    In addition to the Schwab Affiliated Funds and the Schwab Savings Account listed above, Defendants allowed participants to invest money in Schwab's affiliated self-direct brokerage system (the "Self-Directed Brokerage"), called the Schwab Personal Choice Retirement Account.   Through the Self-Directed Brokerage, participants in the Plan could invested their retirement savings in a wide variety of mutual funds and other types of securities.

83.    Through the Self-Directed Brokerage, Plan participants could elect to invest in numerous individual domestic and foreign stocks and bonds, as well as mutual funds and exchange-traded funds ("ETFs"). The mutual funds and ETFs included funds that were offered directly by Schwab or its affiliates, offered by third-parties through Schwab's OneSource program, and other third-party funds.

84.    On information and belief, the Schwab Fiduciary Defendants elected to offer the Self-Directed Brokerage to the Plan, and elected which investments would be offered through the Self-Directed Brokerage Platform, as exercises of their discretionary authority in administering the Plan.

85.    Defendant CS&Co, itself a registered broker dealer, then physically made the Self-Directed Brokerage available to the Plan and its participants. Defendant CS&Co also held the accounts of the Plan and its participants in the Self-Directed Brokerage.

86.    Recordkeeping services for the Self-Directed Brokerage were provided by Defendant SRPS to the Plan at all relevant times.

87.     Defendant CS&Co and its affiliates collected fees from several sources arising out of the Plan's participation in the Self-Directed Brokerage, including transaction fees and commissions and other fees to individual Plan participants who opened Self-Directed Brokerage accounts through the Plan. Defendants CS&Co and SRPS also received "revenue sharing" payments from third-party ETF and mutual fund providers whose funds were made available to the Plan on the Self-Directed Brokerage platform.

88.     Platforms like the Self-Directed Brokerage do provide additional investment options and additional opportunity to diversify. However, the Self-Directed Brokerage is not advantageous for all 401(k) plan investors. Indeed, its byzantine complexity and confusing schedule of fees alone make it inadvisable for all but the most sophisticated of investors. And the additional high levels of risk that investors in the Self-Directed Brokerage are able to take on can magnify the risks of investing exponentially. For example, an individual participant could invest their entire retirement savings account in the stock of a single company through the Self-Directed Brokerage. Yet Schwab made the Self-Directed Brokerage option available to all of the participants in the Plan—not just the company's highest earners or those with the most financial sophistication.

89.     On information and belief, the Schwab Fiduciary Defendants made no meaningful investigation into whether a self-directed brokerage offered by another company would have been a better option for the Plan than Schwab's own Self-Directed Brokerage, either at the time the Self-Directed Brokerage was added or on an ongoing basis as part of periodic review of the Plan's portfolio. Moreover, on information and belief, the Schwab Fiduciary Defendants made no meaningful investigation into whether it would have been more appropriate to forgo offering any sort of self-directed brokerage at all, in light of the high fees and high risks associates with

investing through such a platform.  Instead, on information and belief, the Schwab Fiduciary Defendants included the Self-Directed Brokerage for no other reason than to generate fees for the Schwab Entity Defendants at the expense of the Plan's participants. The Schwab Fiduciary Defendants therefore violated the duties of prudence and loyalty set forth in ERISA § 404(a)(1).

90.    The Schwab Fiduciary Defendants' inclusion of and failure to remove the Self-Directed Brokerage in the Plan also amounted to prohibited transactions within the meaning of ERISA § 406(a) and (b).

a. Defendants CSC, CS&Co., SRPS and CSIM are all parties in interest with respect to the plan under ERISA § 3(14), and the inclusion of and failure to remove the Self-Directed Brokerage amounted to the "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

b.    Moreover, the Schwab Fiduciary Defendants' inclusion of and failure to remove the Self-Directed Brokerage from the Plan resulted from the Schwab Fiduciary Defendants "deal[ing] with the assets of the plan in [their] own interest or for [their] own account" in violation of ERISA § 406(b)(1), "act[ing] in any transaction involving the plan on behalf of a party … whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries" in violation of ERISA § 406(b)(2), and "receiv[ing] any consideration for [their] own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan" in violation of ERISA § 406(b)(3).

***4. Interest Free Loan from Unallocated Plan Cash.***

91.    The Schwab Fiduciary Defendants also used unallocated Plan cash (the "Unallocated Plan Cash") from new contributions, other assets awaiting investment, and from

pending distributions and rollovers for their own benefit.

92.    In particular, Defendant CSBank, as the Plan's Trustee, held the Unallocated Plan Cash in accounts in the Plan's name.

93.    The Schwab Fiduciary Defendants exercised their discretionary authority to give Defendant CSBank discretionary authority to invest the Unallocated Plan Cash and retain as compensation for its services any credit, interest or other earnings it achieved on its investments of the Unallocated Plan Cash.

94.    While the relevant agreements between Defendant CSBank and the Plan provided some limitations on Defendant CSBank's investment of the Unallocated Plan Cash, Defendant CSBank nevertheless had wide discretion over the investment of the Unallocated Plan Cash, and Defendant CSBank also had discretion to set or amend certain of the limitations those agreements placed on its investment of the Unallocated Plan Cash.

95.    Therefore, the Schwab Fiduciary Defendants used the Unallocated Plan Cash as an interest free loan to their affiliate, Defendant CSBank, which retained the proceeds for its own benefit and for the benefit of its corporate parent, Defendant CSC.

96.    On information and belief, Schwab Fiduciary Defendants made no meaningful investigation into whether using the Unallocated Plan Cash as an interest free loan to themselves in this way was in the best interests of the Plan or its participants, or whether the Plan's assets could have been used differently in a way that benefitted the Plan and its participants.

97.    Schwab does not publicize the amount of compensation Defendant CSBank receives from investing the Unallocated Plan Cash. On information and belief, the compensation Defendant CSBank received from investing the Unallocated Plan Cash is grossly excessive in relation to the services Defendant CSBank provides to the Plan. On information and belief, the

Schwab Fiduciary Defendants made no meaningful investigation into whether the banking and trust services for which Defendant CSBank retains the investment proceeds from the Unallocated Plan Cash could have been obtained at a lower cost to the Plan and its participants, or indeed whether the Unallocated Plan could have been used to provide additional benefits to the Plan and its participants. Instead, on information and belief, the Schwab Fiduciary Defendants used the Plan assets – the Unallocated Plan Cash – as an interest free loan to Defendant CSBank for no other reason than to enrich the Schwab Entity Defendants at the expense of the Plan and its participants.

98.    The Schwab Fiduciary Defendants therefore violated the duties of prudence and loyalty set forth in ERISA § 404(a)(1).

99.    The Schwab Fiduciary Defendants' use of the Plan assets as an interest free loan to themselves also amounted to a prohibited transaction within the meaning of ERISA § 406(a) and (b).

a.    Defendant CSC and Defendant CSBank are parties in interest with respect to the plan under ERISA § 3(14), and the use of the Plan's assets as an interest free loan in exchange for services to the Plan amounted to the "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

b.    Moreover, the Schwab Fiduciary Defendants' the use of the Plan's assets as an interest free loan resulted from the Schwab Fiduciary Defendants "deal[ing] with the assets of the plan in [their] own interest or for [their] own account" in violation of ERISA § 406(b)(1), "act[ing] in any transaction involving the plan on behalf of a party … whose interests are adverse

to the interests of the plan or the interests of its participants or beneficiaries" in violation of ERISA § 406(b)(2), and "receiv[ing] any consideration for [their] own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan" in violation of ERISA § 406(b)(3).

## V. CLASS ALLEGATIONS

100.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all participants in and beneficiaries of the Plan at any time within six years of the filing of this Complaint. The period beginning six years preceding the filing of the Complaint up until the time of a final judgment in this action are referred to herein as the "Class Period."

101.   Excluded from the class are the following persons: (a) any of the Defendants, (b) any fiduciaries of the Plans; (c) any of Defendants' officers or directors; (d) any member of the immediate family of and any heirs, successors or assigns of any such excluded party.

**A. Numerosity and Impracticability of Joinder**

102.   Joinder of all members of the class would be impracticable based on the size of the class. Based on the Form 5500 filed with the Department of Labor for 2015, the Plan had more than 18,000 participants and/or beneficiaries. Thus the number of Class members is so large that joinder of all its members is impracticable.

**B. Commonality**

103.   Plaintiff's claims raise common questions of law and fact with the class including:

a.      Whether Defendants violated their ERISA fiduciary duties of prudence and loyalty by including Defendants' affiliated investment products as investment options for the Plan;

b.      Whether Defendants engaged in transactions prohibited by ERISA by including Defendants' Affiliated investment products as investment options for the Plan;

c.      Whether the Plan and its participants suffered losses as a result of Defendants' fiduciary breaches and/or prohibited transactions; and

d.      Whether Defendants are liable to the Plan for restitution or constructive trust with respect to fees transferred to the Defendants or for disgorgement or reimbursement of excessive fees received by or profits generated for the Defendants as a result of the fiduciary breaches and/or prohibited transactions described herein.

**C. Typicality**

104.   Plaintiff's claims are typical of the claims of the class because their claims arise from the same events, practices and/or course of conduct as other members of the class. Plaintiff's claims challenge whether the Plan's fiduciaries acted consistently with their fiduciary duties and whether their breaches caused losses or otherwise harmed the Plan and its participants. Additionally, the prohibited transfer of plan assets to Defendants, or the payment to the Defendants of excessive and unreasonable compensation, occurred at the fund level and form a consistent basis of the claims of all Plan participants. These are claims common to and typical of other Class members. Moreover, these claims seek recovery on behalf of the Plan.

**D. Adequacy**

105.   Plaintiff will fairly and adequately protect the interests of the class.

106.   Defendants do not have any unique defenses against Plaintiff that would interfere with their representation of the class.

107.   Plaintiff has engaged counsel with extensive experience prosecuting class actions in general and ERISA class actions in particular.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**E. Rule 23(b)(1)**

108.   The requirements of Rule 23(b)(1)(A) are satisfied in this case. Fiduciaries of ERISA covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to uniformly act in the best interests of the Plan and its participants. As this action challenges whether Defendants acted consistently with their fiduciary duties to the Plan, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the fiduciaries of the Plan.

109.   The requirements of Rule 23(b)(1)(B) are satisfied in this case. Administration of an ERISA plan requires that all similarly situated participants be treated consistently. As such, whether Defendants fulfilled their fiduciary obligations with respect to the Plan and its participants in this action would, as a practical matter, be dispositive of the interests of the other members of the Class regardless of whether they are parties to the adjudication.

**F. Rule 23(b)(2)**

110.   The requirements of Rule 23(b)(2) are met in this action. Defendants have applied the same or substantially similar investment policies and investment options in the Plan that cover all members of the Class. The fiduciary breaches, co-fiduciary breaches, and prohibited transactions alleged against Defendants with respect to the Schwab Affiliated Products and Services relate to policies that applied to, respectively, all members of the Class. As such, Defendants have acted or refused to act on grounds generally applicable to the Class as a whole.

111.   The primary relief sought on behalf of the Class is a determination that Defendants breached their fiduciary duties and engaged in prohibited transactions, a determination of the amount by which those breaches adversely affected the Plan rather than individual members of

the Class, and a consequent order requiring Defendants to make good those losses to the Plan. Such relief is accomplished by issuance of a declaration or an injunction and therefore the primary requested relief constitutes final injunctive or declaratory on behalf the Class with respect to the Plan .

## G. Rule 23(b)(3)

112.    The requirements of Rule 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants breached their fiduciary duties to the Plan. Similarly, as relief will be on behalf of and will flow to the Plan, common questions related to remedies and relief will likewise predominate over individual issues.

113.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The losses suffered by many of the individual members of the Class are likely small, particularly in relation to the cost to bring this litigation and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights. The fiduciaries of the Plan have an obligation to treat all similarly situated participants similarly and are subject to uniform standards of conduct under ERISA; thus the members of the Class have an interest in having this action proceed in a single action. As such, no Class member has an interest in individually controlling the prosecution of this matter.

## VI. CLAIMS FOR RELIEF

### Count I

### Breach of Fiduciary Duty (ERISA § 404)
### (The Schwab Fiduciary Defendants)

114.    Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

115.    As alleged above, the Schwab Fiduciary Defendants were ERISA fiduciaries for

the Plan pursuant to ERISA §§ 402(a) and/or 3(21) subject to ERISA's fiduciary duties of prudence and loyalty. ERISA § 404(a)(1)(A)-(B).

116.    As alleged above, the Schwab Fiduciary Defendants violated the duties of prudence and loyalty imposed by ERISA § 404(a)(1)(A)-(B) by, amongst other things:

a.      Including the Schwab Affiliated Products and Services as investment options within the Plan or as services for the Plan without conducting an adequate investigation into whether the Schwab Affiliated Products and Services were appropriate for the Plan under the circumstances;

b.      Including the Schwab Affiliated Products and Services as investment options within the Plan or as services for the Plan without conducting an adequate investigation into whether comparable investment options were available from other providers that were more cost effective, had lower fees, were better performing or were otherwise more in line with the interests of the Plan's participants than the Schwab Affiliated Products and Services;

c.      Including the Schwab Affiliated Products and Services as investment options within the Plan or as services for the Plan for the purpose of benefitting the Schwab Entity Defendants;

d.      Failing to conduct an adequate investigation into whether the Schwab Affiliated Products and Services were appropriate for the Plan under the circumstances as part of an ongoing process to monitor the Plan's investments and service arrangements;

e.      Failing to conduct an adequate investigation into whether comparable investment options were available from other providers that were more cost effective, had lower fees, were better performing or were otherwise more in line with the interests of the Plan's participants than the Schwab Affiliated Products and Services as part of an ongoing process to

monitor the Plan's investments and service arrangements; and

f.     Failing to remove the Schwab Affiliated Products and Services as investment options within the Plan or as services for the Plan for the purpose of benefitting the Schwab Entity Defendants.

117.   The Schwab Fiduciary Defendants' fiduciary breaches proximately caused losses to the Plan in an amount to be determined at trial.

118.   The Schwab Fiduciary Defendants are liable to make good those losses to the Plan and for all other available remedies under ERISA §§ 409 and 502(a)(3).

## Count II

### Prohibited Transactions (ERISA § 406(a) & (b))
### (The Schwab Fiduciary Defendants)

119.   Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

120.   As alleged above, the Schwab Fiduciary Defendants were ERISA fiduciaries for the Plan pursuant to ERISA §§ 402(a) and/or 3(21) subject to ERISA's fiduciary duties of prudence and loyalty. ERISA § 404(a)(1)(A)-(B).

121.   ERISA § 406(a) prohibits ERISA fiduciaries from causing ERISA plans to engage in certain enumerated transactions with parties in interest, and ERISA § 406(b) prohibits ERISA fiduciaries from causing ERISA plans to engage in certain enumerated transactions with plan fiduciaries.

122.   As alleged above, the Schwab Fiduciary Defendants caused the Plan to engage in transaction with parties in interest with respect to the Plan and/or with Plan fiduciaries in violation of ERISA § 406(a) & (b) by including and failing to remove the Schwab Affiliated Products and Services as investment options within the Plan or as services for the Plan.

123.   The Schwab Fiduciary Defendants' prohibited transactions proximately caused losses to the Plan in an amount to be determined at trial.

124.   The Schwab Fiduciary Defendants are liable to make good those losses to the Plan and for all other available remedies under ERISA §§ 409 and 502(a)(3).

**Count III**

**Breach of Fiduciary Duty (ERISA § 404)**
**(The Board of Director Defendants)**

125.   Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

126.   The Board of Director Defendants were ERISA fiduciaries for the Plan pursuant to ERISA § 3(21) by virtue of their authority to appoint members of the Committee, and were, as such, subject to ERISA's fiduciary duties of prudence and loyalty in appointing members of the Committee. ERISA § 404(a)(1)(A)-(B). In addition, ERISA fiduciaries with discretionary authority to appoint other fiduciaries have a fiduciary responsibility to monitor and evaluate the performance of those they appoint on an ongoing bases, and to take action, including removal of the appointees, to remedy any failure by the appointees to adequately fulfill their fiduciary obligations.

127.   The Board of Director Defendants violated the duties of prudence and loyalty imposed by ERISA § 404(a)(1)(A)-(B) by, amongst other things:

a.     Failing to appropriately investigate and monitor whether Schwab Fiduciary Defendants were prudently fulfilling their fiduciary role by selecting the Schwab Affiliated Products and Services as investment options within the Plan;

b.     Failing to appropriately investigate and monitor whether Schwab Fiduciary Defendants were loyally fulfilling their fiduciary role by selecting the Schwab Affiliated Products

and Services as investment options within the Plan; and by

c.    Failing to take action to correct the Schwab Fiduciary Defendants imprudence and disloyalty in selecting the Schwab Affiliated Products and Services as investment options within the Plan.

128.    The Board of Director Defendants' fiduciary breaches proximately caused losses to the Plan in an amount to be determined at trial.

129.    The Board of Director Defendants are liable to make good those losses to the Plan and for all other available remedies under ERISA §§ 409 and 502(a)(3).

## Count IV

### Breach of Co-Fiduciary Duty (ERISA § 405)
### (The Schwab Fiduciary Defendants)

130.    Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

131.    As alleged above, the Schwab Fiduciary Defendants were ERISA fiduciaries for the Plan.

132.    ERISA § 405 renders ERISA fiduciaries liable for other fiduciaries' misconduct under certain circumstances.

133.    In addition to their liability for their own fiduciary breaches described above, the Schwab Fiduciary Defendants are liable for the breaches of the Plan's other fiduciaries under ERISA § 405 because they:

a.    Knowing participated in the acts and omissions constituting those breaches despite knowing that those acts or omissions amounted to breaches of fiduciary duty;

b.    Failed to comply with the duties of prudence and loyalty in ERISA § 404(a)(1) in the administration of their own responsibilities, thereby enabling the breaches of the

other fiduciaries; and

       c.    Had knowledge of the breaches by the other fiduciaries but undertook no reasonable efforts under the circumstances to remedy the breaches.

134.    The Schwab Fiduciary Defendants co-fiduciary breaches proximately caused losses to the Plan in an amount to be determined at trial.

135.    The Schwab Fiduciary Defendants are liable to make good those losses to the Plan and for all other available remedies under ERISA §§ 409 and 502(a)(3).

**Count V**

**Knowing Participation in and/or Benefit from Fiduciary Breaches and Prohibited Transactions (ERISA 502(a)(3))**
**(Schwab Entity Defendants)**

136.    Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

137.    As alleged above, the Schwab Entity Defendants were the direct or indirect beneficiaries of the fiduciary breaches, prohibited transactions and co-fiduciary breaches alleged above.

138.    Moreover, in many cases the Schwab Entity Defendants participated in and/or facilitated the fiduciary breaches, prohibited transactions and co-fiduciary breaches alleged above.

139.    The Schwab Entity Defendants knew of the existence of the Plan, and had actual and/or constructive knowledge of the circumstances that rendered the acts and omissions of the Schwab Fiduciary Defendants' fiduciary breaches, co-fiduciary breaches and/or prohibited transactions unlawful.

140.    ERISA § 502(a)(3) permits ERISA plan participants to seek injunctive and other

appropriate equitable relief against anyone who knowingly participants in or benefits from violations of ERISA.

141.   The Schwab Entity Defendants should be enjoined from further knowing participation in or benefitting from the violations of ERISA alleged above.

142.   In addition, the Schwab Entity Defendants must restore to the Plan all property they hold as a result of the Schwab Fiduciary Defendants' fiduciary breaches, co-fiduciary breaches and/or prohibited transactions that in good conscience belongs to the Plan, must disgorge to the Plan the proceeds of such property to the extent it has been disposed of, and must disgorge any profits they received as a result of holding such property.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.   Enter an order declaring that the Schwab Fiduciary Defendants breached their fiduciary and co-fiduciary duties under ERISA and engaged in prohibited transactions as alleged herein;

B.   Enter an order enjoining the Schwab Fiduciary Defendants from further breaches of their fiduciary and co-fiduciary duties under ERISA and from further prohibited transactions;

C.   Enter an order requiring the Schwab Fiduciary Defendants to make good to the Plan the losses their fiduciary breaches, co-fiduciary breaches and/or prohibited transactions caused the Plan pursuant to ERISA § 409;

D.   Enter an order enjoining the Schwab Entity Defendants from further knowing participation in and receipt of benefit from the Schwab Fiduciary Defendants' breaches of their fiduciary and co-fiduciary duties under ERISA and prohibited transactions;

E.     Enter an order requiring the Schwab Entity Defendants to disgorge to the Plan (a) any and all property they hold as a result of the Schwab Fiduciary Defendants' and fiduciary breaches, co-fiduciary breaches and/or prohibited transactions that in good conscience belongs to the Plan, (b) the proceeds of such property to the extent it has been disposed of, and (c) any profits they received as a result of holding such property;

F.     Enter an order requiring the Schwab Fiduciary Defendants to provide a full accounting of all fees paid, directly or indirectly, by the Plan to the Defendants;

G.     Awarding Plaintiff and the Class their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), the common benefit doctrine and/or the common fund doctrine;

H.     Awarding pre-judgment and post-judgment interest; and

I.     Awarding such other remedial or equitable relief as the Court deems appropriate.


Date: January 19, 2017                          Respectfully Submitted

                                                */s/ James A. Bloom*
                                                James A. Bloom

                                                Todd M. Schneider (SBN 158253)
                                                James A. Bloom (SBN 311051)
                                                Kyle G. Bates (SBN 299114)
                                                SCHNEIDER WALLACE
                                                COTTRELL KONECKY
                                                WOTKYNS LLP
                                                2000 Powell Street, Suite 1400
                                                Emeryville, California 94608
                                                Telephone: (415) 421-7100
                                                Facsimile: (415) 421-7105
                                                tschneider@schneiderwallace.com
                                                jbloom@schneiderwallace.com
                                                kbates@schneiderwallace.com

COMPLAINT

Garrett W. Wotkyns (pro hac vice application forthcoming)
John J. Nestico (pro hac vice application forthcoming)
SCHNEIDER WALLACE
COTTRELL KONECKY
WOTKYNS LLP
8501 North Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
gwotkyns@schneiderwallace.com
jnestico@schneiderwallace.com
T: (408) 428-0144
F: (866) 505-5036

Todd S. Collins (pro hac vice application forthcoming)
Shanon J. Carson (pro hac vice application forthcoming)
Ellen T. Noteware (pro hac vice application forthcoming)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365
T: (215) 875-3000
F: (215) 875-4604
tcollins@bm.net
scarson@bm.net
enoteware@bm.net

COMPLAINT

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 16, 2017, I electronically filed the foregoing document with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

*/s/ James A. Bloom*
James A. Bloom
SCHNEIDER WALLACE
COTTRELL KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
jbloom@schneiderwallace.com
