Todd M. Schneider (SBN 158253)
James A. Bloom (SBN 311051)
Kyle G. Bates (SBN 299114)
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
jbloom@schneiderwallace.com
kbates@schneiderwallace.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL F. DORMAN, individually as a participant in the SCHWABPLAN RETIREMENT SAVINGS AND INVESTMENT PLAN and on behalf of a class of all those similarly situated, | Case No.: 4:17-CV-00285 (CW) |
| | **SECOND AMENDED COMPLAINT** |
| | **CLASS ACTION (ERISA)** |
| Plaintiff, | |
| v. | |
| THE CHARLES SCHWAB CORPORATION; CHARLES SCHWAB & CO INC.; SCHWAB RETIREMENT PLAN SERVICES INC.; CHARLES SCHWAB BANK; CHARLES SCHWAB INVESTMENT MANAGEMENT, INC.; JAY ALLEN; JONATHAN BEATTY; BRADLEY PETERSON; KATHY ANDERSON; NAUREEN HASSAN; JOHN CLARK; BRIAN MCDONALD; ED OBUCHOWSKI; DAVE CALLAHAN; DIANE RUSSELL; MARTHA TUMA, JOHN DOES 12-50 and XYZ CORPORATIONS 1-5, | "REDACTED VERSION OF DOCUMENT SEALED PURSUANT TO COURT ORDER (ECF NO. 124)" |
| Defendants. | |

1

2

## I. NATURE OF THE ACTION

3      1.      The Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.

4   ("ERISA") imposes strict fiduciary duties of prudence and loyalty on fiduciaries for ERISA covered

5   retirement plans. ERISA § 404(a)(1), *codified at* 29 U.S.C. § 1104(a)(1). These duties, which

6   require fiduciaries to act "solely in the interest of [plan] participants and beneficiaries," ERISA §

7   404(a)(1), are "the highest known to law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996).

8      2.      Plaintiff Michael F. Dorman brings this action pursuant to Sections 502(a)(2) and

9   502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29

10  U.S.C. §§ 1132(a)(2) and 1132(a)(3). Plaintiff brings this action on behalf of the Schwab Plan

11  Retirement Savings and Investment Plan (the "Plan") to obtain the relief provided under ERISA

12  § 409, 29 U.S.C. § 1109, for losses suffered by the Plan resulting from the Defendants' fiduciary

13  breaches and prohibited transactions described herein and for other appropriate equitable and

14  injunctive relief under ERISA § 502(a)(3). Plaintiff brings this action on behalf of a class of

15  similarly situated participants in and beneficiaries of the Plan.

16     3.      The claims asserted herein arise from Defendants' imprudent and disloyal exercise

17  of their discretionary fiduciary authority over the Plan to include Defendants' own affiliated

18  investment products as investment options within the Plan and sale of their own services to the

19  Plan. Defendants thereby reaped significant fees and profits at the expense of the Plan and its

20  participants, including Plaintiff. As a result, Defendants violated their ERISA fiduciary duties of

21  prudence and loyalty, violated their co-fiduciary duties, and engaged in transactions prohibited by

22  ERISA § 406(a) and (b). In addition, Defendants knowingly participated in and/or knowingly

23  received the benefits from the fiduciary and co-fiduciary breaches and prohibited transactions

24  caused by the other defendants.

25

26

27

28

SECOND AMENDED COMPLAINT
CASE NO. 4:17-CV-00285

## II. PARTIES AND THE PLAN

**A.      Defendants**

4.      Defendant the Charles Schwab Corporation ("CSC") is a Delaware corporation with its principal place of business in San Francisco, California.

5.      Defendant Charles Schwab & Co. Inc. ("CS&Co") is a California corporation with its principal place of business in San Francisco, California. CS&Co is a wholly owned subsidiary of Defendant CSC.

6.      Defendant Charles Schwab Investment Management, Inc. ("CSIM") is a Delaware corporation with its principal place of business in San Francisco, California. CSIM is a wholly owned subsidiary of Defendant CSC.

7.      Defendant Schwab Retirement Plan Services, Inc. ("SRPS") is an Ohio corporation with its principal place of business in Richfield, Ohio. SRPS is a wholly owned subsidiary of Defendant CSC.

8.      Defendant Charles Schwab Bank ("CSBank") is a federal savings association with its principal office in Reno, Nevada. CSBank is a wholly owned subsidiary of Defendant CSC.

9.      Defendant Walter W. Bettinger, III ("Bettinger") is a member of the Board of Directors of CS&Co. On information and belief, Defendant Bettinger is a citizen and resident of California.

10.      Defendant Charles R. Schwab ("Charles R. Schwab") is a member of the Board of Directors of CS&Co. On information and belief, Defendant Charles R. Schwab is a citizen and resident of California.

11.      Defendant Joseph R. Martinetto ("Martinetto") is a member of the Board of Directors of CS&Co. On information and belief, Defendant Martinetto is a citizen and resident of California.

12.     Defendants John Does 1-5 are the remaining members of the Board of Directors of CS&Co during the Class Period.

13.     Collectively, Defendants Bettinger, Charles R. Schwab, Martinetto and John Does 1-5 are referred to herein as the "Board of Director Defendants."

14.     On information and belief, Defendant Martha Tuma ("Tuma") was a member of the Employee Benefits Administrative Committee (the "Committee") during the Class Period. On information and belief, Defendant Tuma is a citizen and resident of California.

15.     On information and belief, Defendant Jay Allen ("Allen") was a member of the Committee during the Class Period. On information and belief, Defendant Allen is a citizen and resident of California.

16.     On information and belief, Defendant Dave Callahan ("Callahan") was a member of the Committee during the Class Period. On information and belief, Defendant Callahan is a citizen and resident of California.

17.     On information and belief, Defendant Bradley Peterson ("Peterson") was a member of the Committee during the Class Period. On information and belief, Defendant Peterson is a citizen and resident of California.

18.     On information and belief, Defendant John C. Clark ("Clark") was a member of the Committee during the Class Period. On information and belief, Defendant Clark is a citizen and resident of California.

19.     On information and belief, Defendant Kathy Anderson ("Anderson") was a member of the Committee during the Class Period. On information and belief, Defendant Anderson is a citizen and resident of California.

20.     On information and belief, Defendant Naureen Hassan ("Hassan") was a member of

the Committee during the Class Period. On information and belief, Defendant Hassan is a citizen and resident of California.

21.     On information and belief, Defendant Ed Obuchowski ("Obuchowski") was a member of the Committee during the Class Period. On information and belief, Defendant Obuchowski is a citizen and resident of California.

22.     On information and belief, Defendant Diane Russell ("Russell") was a member of the Committee during the Class Period. On information and belief, Defendant Russell is a citizen and resident of California.

23.     On information and belief, Defendant Brian McDonald ("McDonald") was a member of the Committee during the Class Period. On information and belief, Defendant McDonald is a citizen and resident of California.

24.     On information and belief, Defendant Jonathan Beatty ("Beatty") was a member of the Committee during the Class Period. On information and belief, Defendant Beatty is a citizen and resident of California.

25.     Defendants John Does 12-25 are the remaining members of the Committee during the Class Period.

26.     Collectively, Defendants Tuma, Allen, Callahan, Peterson, Clark, Anderson, Hassan, Obuchowski, Russell, McDonald, Beatty and John Does 12-25 are referred to herein as the "Committee Defendants."

27.     Defendants John Does 26-50 and XYZ Corporations 1-5 are any other individuals and entities that were named fiduciaries for the Plan within the meaning of ERISA § 402(a), de facto fiduciaries for the Plan within the meaning of ERISA § 3(21)(A), or who knowingly participated in or received a benefit from the fiduciary breaches and prohibited transactions

described herein and who therefore must disgorge any property in their possession that in good conscience belongs to the Plan pursuant to ERISA § 502(a)(3).

28.     Plaintiff has been unable to identify the individuals and entities named as John Does 12-50 and XYZ Corporations 1-5. Plaintiff will endeavor to identify those individuals and entities in discovery and will seek leave to amend the complaint to name them once their identities have been ascertained.

29.     Collectively, CS&Co., CSC, SRPS, CSBank, CSIM, the Committee Defendants, and John Does 12-50 and XYZ Corporations 1-5 are referred to herein as the "Schwab Fiduciary Defendants."

30.     Collectively, CS&Co., CSC, SRPS, CSBank, CSIM are referred to herein as the "Schwab Entity Defendants."

**B.      The Plan**

31.     The Plan is an "employee pension benefit plan" pursuant to ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) that is designed to provide retirement income to Defendants' employees who participate in the Plan. In addition, the Plan is a "defined contribution plan" and an "individual account plan" which provides retirement benefits "based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses… which may be allocated to such participant's account." ERISA § 3(34), 29 USC § 1002(34). Thus unlike traditional defined benefit pensions, in a defined contribution plan like the Plan, the amount of retirement savings that participants (such as Plaintiff) receive at retirement is simply a matter of how much is in their individual accounts at the time—contributions, less fees, plus any investment returns. The Plan allows participants to have a portion of their wages contributed to the plan on their behalf and to receive matching employer contributions.

SECOND AMENDED COMPLAINT
CASE NO. 4:17-CV-00285

32.     The Plan covers all eligible employees of Defendant CSC and participating affiliates of CSC.

33.     At all relevant times, Defendant CSC has been the sponsor of the Plan within the meaning of ERISA § 3(16)(B).

34.     At all relevant times, Defendant CS&Co has been the Plan Administrator for the Plan within the meaning of ERISA § 3(16)(A).

35.     Pursuant to the Plan, Defendant CS&Co fulfilled its administrative functions through the Committee.

36.     Defendant CS&Co and the Committee Defendants administered the Plan at Defendant CSC's offices in San Francisco, California.

37.     Defendant CS&Co., through the Board of Director Defendants, appointed the members of the Committee, including the Committee Defendants.

38.     Pursuant to the Plan, the Committee Defendants were required to periodically report to the Board of Director Defendants with respect to the Committee's administrative functions under the Plan.

39.     The Plan also expressly gave the Board of Director Defendants the authority to remove any members of the Committee at any time.

40.     The Plan's governing documents specify that Defendant CS&Co is a named fiduciary of the Plan for purposes of ERISA § 402(a), as is any "participating employer" whose employees participate in the Plan. On information and belief, Defendants CSC, SRPS, CSBank and CSIM are also "participating employers" for purposes of the Plan, and are thus also named fiduciaries for the Plan pursuant to ERISA § 402(a).

41.     Defendant CS&Co and the Committee Defendants retained the Charles Schwab Trust

Company to serve as the trustee for the Plan. In 2008, the Charles Schwab Trust Company was merged into Defendant CSBank, which became the Plan's trustee by operation of the merger. Defendant CSBank has served as the Plan's trustee during the remainder of the Class Period, a service which it provides through its Business Trust Division.

42.     Defendant CS&Co and the Committee Defendants retained Defendant SRPS to provide recordkeeping and related services to the Plan, services which Defendant SRPS has in fact provided at all relevant times.

**C.     Plaintiff**

43.     Plaintiff Michael F. Dorman is a citizen and resident of New Jersey and is a participant, within the meaning of ERISA § 3(7), in the Plan. During the Class Period, Plaintiff held the following investment options provided by the Plan, all of which were affiliated with Defendants, in addition to certain investments in funds that were not affiliated with Defendants:   Schwab Bank Savings Cash Account, Schwab Managed Retirement Trust 2015 CL III, Schwab Managed Retirement Trust 2015 CL IV, Schwab Fundamental US Large Company Index Fund, Schwab Fundamental US Small Company Index Fund, Schwab Fundamental International Large Company Index Fund, Schwab Fundamental International Small Company Index Fund,  Schwab S&P 500 Index Fund, Schwab International Index Fund, and Schwab Small-Cap Index Fund

**III. JURISDICTION AND VENUE**

44.     Plaintiff brings this action pursuant to ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3). This Court has subject matter jurisdiction over Plaintiff's claims pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

45.     Venue lies in the Northern District of California pursuant to ERISA § 502(e)(2), 29

U.S.C. § 1132(e)(2), because several Defendants reside within or may be found in this district, the Plan is administered in this district, and/or the alleged breaches of the duties imposed by ERISA took place in this district.

46.     The Court has general personal jurisdiction over Defendants CSC, CS&Co. and CSIM because they are incorporated or organized in California and/or have their principal places of business within this district.

47.     The Court has general personal jurisdiction over the Board of Director Defendants and the Committee Defendants because, on information and belief, they reside in and are citizens of California.

48.     The Court has specific personal jurisdiction over all Defendants because they provided services for the Plan in this district and/or they engaged in the conduct described herein which took place in and/or was specifically directed towards this district.

## IV. FACTUAL ALLEGATIONS

49.     In defined contribution plans, employees' benefits at retirement "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." Tibble v. Edison Int'l, 135 S. Ct. 1823, 1825 (2015). Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire.

50.     Over time, even small differences in fees and performance compound and can result in vast differences in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." Tibble, 135 S. Ct. at 1825.

51.     A 2009 study by the Government Accountability Office found that "even a seemingly small fee can have a large negative effect on savings in the long run. As shown in figure 1 [included below], an additional 1 percent annual charge for fees would significantly reduce an account balance at retirement."



**Figure 1: Effect of 1-Percentage Point Higher Annual Fee on a $20,000 DC Plan Balance Invested over 20 Years**

Government Accountability Office, 401(K) PLANS Several Factors Can Diminish Retirement Savings, but Automatic Enrollment Shows Promise for Increasing Participation and Savings, No. 10-153T.

***The Schwab Affiliated Products and Services.***

52.     The Schwab Fiduciary Defendants had a fiduciary obligation to prudently and loyally select the investment options that would be available to the Plan's participants.  That obligation required the Schwab Fiduciary Defendants to carefully, skillfully, prudently and diligently investigate the different investment options that they could include, and to select the best and most cost-effective options available. In so doing, they were required to act solely in the interests of the participants and beneficiaries, and chose investment options for the exclusive purpose of providing

benefits to the participants and beneficiaries.

53.     But instead of managing the Plan solely in the interests of its participants and beneficiaries by carefully and prudently selecting the best and most cost-effective investment options available, the Schwab Fiduciary Defendants imprudently and disloyally larded the Plan with expensive and poorly performing investment products and services offered and managed by the Schwab Entity Defendants and their affiliates and which paid fees to the Schwab Entity Defendants – the "Schwab Affiliated Products and Services." The Schwab Fiduciary Defendants included the Schwab Affiliated Products and Services in the Plan in breach of their fiduciary duties of prudence and loyalty.

54.     At issue in this case are several types of Schwab Affiliated Products and Services, categorized here for ease of reference as: (1) the "Affiliated Funds," (2) the "Schwab Bank Savings Cash Account," and (3) the "Interest Free Loan from Unallocated Plan Cash." In addition, in violation of ERISA and Department of Labor ("DOL") regulation, Defendants received excessive and unreasonable compensation from the operation of the Plan as a result of fees, revenue sharing payments and other revenues that Defendants caused the Plan to pay Defendants out of Plan assets.

55.     Minutes of meetings of the Employee Benefits Administrative Committee ("EBAC") and related reports and analyses indicate that, the Schwab Fiduciary Defendants made no meaningful investigation, or ignored recommendations of advisors or consultants, about whether these Schwab Affiliated Products and Services were prudent for the Plan, or whether alternative funds offered by other providers would be more appropriate, cost effective or better performing or whether Defendants charged excessive fees and engaged in prohibited transactions with respect to the operation of the Plan. Instead, the Schwab Fiduciary Defendants imprudently and disloyally elected to provide the Schwab Affiliated Products and Services to the Plan in an effort to generate

fees for the Schwab Entity Defendants at the expense of the Plan and its participants.

56.     Moreover the fees collected by the Schwab Entity Defendants from the Plan for the Schwab Affiliated Products and Services were excessive, unreasonable and far exceeded the real costs associated with administering the Plan.

### 1.     The Affiliated Funds.

57.     Despite the fact that they were more expensive than comparable alternatives available in the market, and despite the fact that they performed no better or even, sometimes, worse than market peers, the Schwab Fiduciary Defendants included funds managed by the Schwab Entity Defendants or their affiliates (the "Schwab Affiliated Funds") as investment options within the Plan.

58.     During the Class Period, the Schwab Fiduciary Defendants also included a variety of Schwab mutual funds, ten Schwab "target date" funds, a Schwab stable value fund, a Schwab money market fund, and a Schwab savings account as investment options (the stable value fund, money market fund, and savings account are discussed in more detail below.

59.     These Schwab Affiliated Funds had higher fees and worse performance than comparable funds from other providers. By the year end 2015, over $500 million in Plan assets were invested in these Schwab Affiliated Funds.

60.     For example, the Schwab International Index Fund had fees of 19 basis points in 2011. Other companies offered international index funds with substantially similar benchmarks, investment mandates and performance but lower fees, such as the Fidelity International Index Fund (fees of 10 basis points) and the Vanguard Developed Markets Index Fund (13 basis points). Similarly, the Schwab Small- Cap Index Fund had fees of 19 basis points in 2011, but other, less expensive small cap index funds were available in the market, including the Vanguard Small Cap

Index (10 basis points).

61.    In addition, the "target date" funds offered by Schwab, called the "Schwab Managed Retirement Trust  Funds", were far more expensive than comparable target date funds available on the market, and from 2008-2011, underperformed  their peers. For example, the Schwab Managed Retirement Trust Funds cost significantly more than the comparable passive target date funds offered by Vanguard (the "Vanguard Target Retirement Funds"), but on average performed much worse than the Vanguard funds between 2008-2011:

**Table 1**

| Target Retirement Year | Schwab Managed Retirement Trust Fund Fee | Vanguard Target Retirement  Fund Fee | Vanguard Target Retirement  Fund Average Annualized Overperformance vs. Schwab Managed Retirement Trust Fund, 2008-2011 |
|---|---|---|---|
| 2010 | 0.45%-54% | 0.14% | 0.42% |
| 2015 | 0.45%-54% | 0.14% | 0.30% |
| 2020 | 0.45%-54% | 0.14% | 0.31% |
| 2025 | 0.45%-54% | 0.15% | 0.22% |
| 2030 | 0.45%-54% | 0.15% | 0.26% |
| 2035 | 0.45%-54% | 0.15% | 0.06% |
| 2040 | 0.45%-54% | 0.16% | 0.44% |
| 2045 | 0.45%-54% | 0.16% | 0.27% |
| 2050 | 0.45%-54% | 0.16% | 0.41% |
| Income Fund | 0.45%-54% | 0.14% | 0.40% |

62.    Defendants failed to prudently monitor the performance of the Schwab Managed Retirement Trusts, which generally performed poorly over time. For example, in the fourth quarter of 2010, the performance of five of the ten funds was measured on a five year basis against that of the applicable Schwab Managed Retirement Trust Index (the "Index") and the applicable Mercer Mutual Fund Lifecycle Universe Median (the "Universe Median"). These five funds

underperformed in seven of the 10 comparisons.  With regard to four of these funds, it was the 13th consecutive quarter that they had underperformed the Index; for the fifth fund, it was the fifth consecutive quarter.

63.    A year later, in the fourth quarter of 2011, the same five funds underperformed the Index and the Universe Median, again measured on a five year basis, in nine separate instances. That is, in only one of ten instances in which these five funds were measured against the Index and the Universe Median on a five year basis did a fund outperform or match the comparator. With regard to four of the five funds, it was the 17th consecutive quarter that they had underperformed the Index; for the fifth fund, it was the third consecutive quarter.  With regard to the four funds that underperformed in comparison to the Universe Median, one had underperformed for three consecutive quarters, two for four, and one for nine consecutive quarters.

64.    In the fourth quarter of 2012, all ten of the Schwab Managed Retirement Trust Funds were measured against the Index and the Universe Median on a five year basis.  One of the ten funds underperformed the Index; for that fund it was the 21st consecutive quarter of underperformance. Four of the ten funds underperformed the Universe Median. For two of those four funds it was the second consecutive quarter of underperformance; for a third it was the eighth.

65.    In the fourth quarter of 2013, on a five-year basis, none of the ten funds underperformed the Index, and only two underperformed the Universe Median. However, on a three year basis, six of the ten funds underperformed the Index, four of them for the fourth consecutive quarter.

66.    Defendant CSBank served as the trustee for the Schwab Managed Retirement Trust Funds (which are funds of funds) and received fees from the Funds in that capacity. CSBank also served as trustee for many of the underlying funds that the Schwab Managed Retirement Trust

SECOND AMENDED COMPLAINT
CASE NO. 4:17-CV-00285

Funds were invested in were also managed by Schwab affiliates, meaning that the Schwab Entity Defendants received revenue from the Plan through its investment in the Smart Retirement Funds and additional compensation from the funds in which the Smart Retirement Funds were invested.

67.     Any prudent fiduciary investigating whether to include the Schwab Managed Retirement Trust Funds or target date funds from another provider, such as the Vanguard Target Retirement Funds, would have compared the relative fees and performance of those funds during the preceding years. As Table 1 reflects, the Vanguard Target Retirement Funds had fees more than 80% lower than the Schwab Managed Retirement Trust Funds, and materially outperformed the Schwab Managed Retirement Trust Funds during the years leading up to the start of the Class Period. Yet the Schwab Fiduciary Defendants continued to include the Schwab Managed Retirement Trust Funds as investment options until 2014, by which time the Plan had more than $200 million invested in the Schwab Managed Retirement Trust Funds.

68.     No prudent or loyal fiduciary who performed a reasonably thorough investigation would have included the Schwab Affiliated Funds such as the Schwab International Index Fund, the Schwab Small Cap Index Fund, the other Schwab mutual funds, or the Schwab Managed Retirement Trust Funds during the Class Period when other comparable funds with the same objective, lower fees and better performance were available. On information and belief, the Schwab Fiduciary Defendants made no thorough investigation into whether other, less expensive, better performing funds might be a better fit for the Plan's participants, either at the time each Affiliated Fund was added as an investment option or on an ongoing basis as part of periodic review of the Plan's portfolio. Instead, on information and belief, the Schwab Fiduciary Defendants included the Schwab Affiliated Funds for no other reason than to generate fees for the Schwab Entity Defendants at the expense of the Plan's participants. The Schwab Fiduciary Defendants therefore violated the

duties of prudence and loyalty set forth in ERISA § 404(a)(1).

69.    The Schwab Fiduciary Defendants' inclusion of and failure to remove the Affiliated Funds in the Plan also amounted to prohibited transactions within the meaning of ERISA § 406(a) and (b).

a.    Defendants CSC, CS&Co., SRPS and CSIM are all parties in interest with respect to the plan under ERISA § 3(14), and the inclusion of and failure to remove the Self-Directed Brokerage amounted to the "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

b.    Moreover, the Schwab Fiduciary Defendants' inclusion of and failure to remove the Schwab Affiliated Funds from the Plan resulted from the Schwab Fiduciary Defendants "deal[ing] with the assets of the plan in [their] own interest or for [their] own account" in violation of ERISA § 406(b)(1), "act[ing] in any transaction involving the plan on behalf of a party … whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries" in violation of ERISA § 406(b)(2), and "receiv[ing] any consideration for [their] own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan" in violation of ERISA § 406(b)(3).

### 2.    *Schwab Stable Value and CSBank Savings Account.*

70.    Until April 30, 2012, the Schwab Fiduciary Defendants included a collective investment trust called the Schwab Stable Value Fund as a Plan investment option. The Schwab Stable Value Fund was managed by Defendant CSBank.

71.    Stable value funds and insurance company guaranteed accounts are common investments in large defined contribution plans like the Plan—and they in fact are designed specifically for use in such plans. Stable value funds are conservatively managed to provide a stable rate of interest and preserve principal. These funds guarantee that a retirement plan investor will receive the sum of his or her contributions to the fund plus accrued interest.  In other words, these funds         guarantee against loss, and qualify as capital preservation funds. Because they hold longer-duration instruments (three to four-year duration), they generally outperform money market funds and bank deposits.

72.    According to the 2015 Stable Value Study published by MetLife, stable value returns were "*more than double*" the returns of money market funds from 1988 to 2015, and 100% of stable value providers and almost 90% of financial advisors to defined contribution plans "agree that stable value returns have outperformed money market returns over the last 25 years." (emphasis added). MetLife, *2015 Stable Value Study: A Survey of Plan Sponsors, Stable Value Fund Providers and Advisors* at 7 (2015).[1] *See also* Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between. Stable Value and Money Market*, 39 AKRON L. REV. 9, 24 (2006) (In contrast to money market funds, stable value funds "can invest in longer-term financial instruments", and thus, "Stable Value Funds simply outperform Money Market Funds.").

73.    In addition to longer duration instruments generating excess returns over money market investments, stable value funds provide a guaranteed rate of return to the investor, referred to as a crediting rate, and protect against the loss of principal and accrued interest. This protection

---

[1]    *Available      at*      https://www.metlife.com/assets/cao/institutional-retirement/2015StableValueStudy.pdf (last visited Feb. 9, 2016).

is provided through a wrap contract issued by a bank, insurance company or other financial institution that guarantees the book value of the participant's investment.

74.     Since the financial crisis of 2008, readily available stable value funds and insurance company guaranteed accounts have provided an investment return that was ten times greater than most money market funds and twenty times greater than the interest paid on the CSBank Savings Cash Account.  The actual return on the Schwab Stable Value Fund over the five-year period preceding the closure of the fund was twenty-five times greater than the interest paid by CSBank.

75.     At year-end 2011, the Plan had more than $135 million invested in the Schwab Stable Value Fund. The stated expense ratio for the Stable Value Fund was 0.015%, or 15 basis points, earning Defendant CSBank an annual fee of $202,500 in 2011.

76.     At some point toward the end of 2011, CSBank, as the sponsor and trustee for the Stable Value Fund, decided to terminate the fund in its entirety. The fund closure was announced at the September 2011 meeting of the EBAC.  As a result of the closing of the Stable Value Fund, the EBAC was obligated to select a replacement.  The minutes of the September 2011 meeting made reference to an FDIC insured product, a product that would later be identified as the Schwab Bank Savings Cash Account. The minutes indicated that Mercer, the investment consultant for the Plan, would evaluate and make recommendations for a replacement for the Stable Value Fund.

77.     At the time, the Stable Value Fund held more than $8 billion in assets and was held by more than fifteen hundred retirement plans. The one-year return on the Stable Value Fund for the year ended March 31, 2012 was 4.52%.  The fund's average annual returns were 3.38% for the three-year period, and 3.84% for the five-year period, ended March 31, 2012, the period during which Defendants made critical decisions regarding how to replace the fund.

78.     The minutes of the November 2011 meeting of the EBAC indicate that, due to the

involvement of CSBank in connection with the selection of a replacement fund, an independent fiduciary would be retained to select a replacement for the Stable Value Fund and a report would be presented to the EBAC at a special January 2012 meeting.  In other words, the EBAC was considering in 2011 replacing the Stable Value Fund with the Schwab Bank Savings Cash Account, an FDIC insured product.  But because CSBank was a fiduciary as Trustee of the Plan and would also be a fiduciary if the Bank held Plan assets on deposits, and because the Plan fiduciary responsible for selecting a replacement for the Stable Value Fund was the Trustee's parent corporation, the EBAC determined that an independent fiduciary would be required to select Schwab Bank in order to avoid claims of self-dealing.

79.    As it turns out, the EBAC selected a blend of two separate funds as a replacement. Seventy percent of the Stable Value Fund was transferred to a Short Duration Bond Strategy that was in turn invested equally in the JPMorgan Short Duration Bond Fund and the PIMCO Low Duration Fund, and 30 percent was invested in the Schwab Value Advantage Money Market Fund. The Short Duration Bond Strategy did not provide any guarantee of principal and, therefore, did not qualify as a capital preservation option.

80.    Less than two years later, the EBAC, having first considered it in 2011, replaced the Schwab Value Advantage Money Fund and the Short Duration Bond Strategy with the Schwab Bank Savings Cash Account.

81.    In discovery in this action, Defendants have produced numerous Mercer evaluations and EBAC meeting minutes covering the entire relevant Class period, but they did not produce the Mercer evaluation discussed at the September 2011 EBAC meeting, or the report of an independent fiduciary discussed at the November 2011 EBAC meeting, or even the minutes of the January 2012 special meeting announced at the November meeting.

82.     Defense Counsel has provided assurances that Defendants have produced all responsive, non-privileged EBAC meeting documents that pertain to Plaintiff's investments and are not subject to one of the grounds for objection in Defendants' written responses to Plaintiff's document requests.  It is reasonable to infer that none of the Mercer reports, or EBAC meeting minutes, or the report of an independent fiduciary would be subject to privilege, being of the same character as numerous other EBAC meeting minutes and related consultant reports that Defendants produced.

83.     One can reasonably infer from these events that there is no Mercer or independent fiduciary report and no minutes of a January 2012 special meeting, if such a meeting occurred.

84.     By June 2012, according to a Review of Fiduciary Matters presented to the EBAC at its June 2012 meeting, Defendants had developed a prohibited transaction exemption strategy to attempt to avoid a prohibited transaction associated with direct and indirect fees that Defendants would receive in connection with providing services to the Plan, including a strategy that would allow selection of a fund such as the Schwab Bank Savings Cash Savings Account.

85.     At the February 2014 meeting of the EBAC, the Schwab Bank Savings Cash Account was selected as the Plan's capital preservation option, but not expressly by name.  The minutes refer only to the "FDIC insured money market deposit account ('MMDA')". In fact, throughout the period during which the EBAC was considering the Schwab Bank Savings Cash Account, meeting minutes referred only to the FDIC insured account.  There is nothing in any of the EBAC meeting minutes indicating that, after the initial selection of the 70/30 blended replacement for the Stable Value Fund, any capital preservation option other than the Schwab Bank Savings Cash Account was even considered by the EBAC.

86.     During the short period between May 2012 and May 2014 in which the 70/30 blended

strategy was in place after the closing of the Stable Value Fund, CSBank received a management fee of 40 basis points on the amount invested in the Value Advantage Money Market ($50 million in 2012 and $71 million in 2013), instead of the 15 basis points it earned on the Stable Value Fund.

87.   Once assets were mapped into the Schwab Bank Savings Cash Account, CSBank earned at least ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████

88.   Defendants rely on the prohibited transaction exemption provided in ERISA § 408(b)(4), which requires that the Plan receive a reasonable rate of interest.  Whether the rate is reasonable depends at least in part on the amount CSBank is earning through the investment of deposits.  Even assuming that the amount reported in the annual Revenue and Expense Analysis as "Bank deposit revenue from the FDIC insured accounts" was the total amount earned by CSBank from the investment of the Bank's deposits, CSBank paid participants only one tenth of that amount as interest on the Plan's investment in the Schwab Bank Savings Cash Account, which is not a reasonable rate of interest.

89.   Viewed from another perspective, while the Plan was invested in the Schwab Stable Value Fund, CSBank was earning only 15 basis points as an investment management fee for managing a portfolio of intermediate-term bonds and wrap contracts, while participants were earning an investment return of more than three percent.  Once the transition from Stable Value to the Schwab Bank Savings Cash Account was complete, CSBank was receiving compensation of more than 1% while participants' investment return was a meagre 12 to 15 basis points.  Under the

circumstances, the strategy pursued by Defendants in transitioning from the Stable Value Fund to the 70/30 blended strategy, and then to the Schwab Bank Savings Cash Account was imprudent, and was part of Defendants' plan since as early as November 2011 to benefit CSBank at the expense of Plan participants.

90.     Additionally, by failing to pay a reasonable rate of interest, Defendants failed to meet the conditions required for the availability of the 408(b)(4) exemption, Defendants have caused the Plan to engage in prohibited transactions, including violations of ERISA § 406(a)(1)(C), § 406(a)(1)(D), and § 406(b)(1).

91.     Moreover, Section 408(b)(4) does not contain an exemption from other provisions of the Act, such as a violation of Defendants' duty of diligence and prudence set for in ERISA section 404. 29 CFR § 2550.408b-4(a).

92.     Numerous stable value funds are available in the marketplace from a variety of providers.

93.     The Hueler Index published by Hueler Analytics is the industry standard for reporting returns of stable value funds, and its index includes data on numerous stable value funds with assets under management exceeding $100 billion. The Hueler Index average thus represents a reasonable estimate of the average returns of a typical stable value fund.

94.     The average stable value returns as reflected in the Hueler index have far exceeded the returns of the Schwab Savings Account or the Schwab Value Advantage Money Fund:

**Table 2**

|  | Year | Return | Hueler Index Average Return | Schwab Affiliated Option Underperformance |
|---|---|---|---|---|
| Schwab Value Advantage Money Fund | 2012 | 0.01% | 2.26% | 2.25% |
|  | 2013 | 0.01% | 1.84% | 1.83% |

| Schwab Savings Account | 2014 | 0.15% | 1.69% | 1.54% |
| | 2015 | 0.13% | 1.77% | 1.64% |

95.     Another readily available fund, the MassMutual Guaranteed Interest Account, had an average annual return of 2.81% for the five-year period ended December 31, 2014, net of fees.

96.     The returns of the Value Advantage Money Fund and the Schwab Bank Savings Cash Account fail to even satisfy Schwab's own performance standard written into its investment policy statement for money market funds, which requires money market funds to provide a rate of return that exceeds inflation.  To put the dismal return numbers for the Schwab Value Advantage Money Fund and Schwab Bank Savings Cash Account into perspective, inflation in the United States averaged 1.24% annually from April, 2012 (when the Value Advantage Money Fund was first offered in the Plan) until year end 2015. The Schwab Value Advantage Money Fund and Schwab Savings Account together yielded less than 0.08% over that same period on an annual basis. Thus participants effectively lost more than 1% per year simply by investing money in the Schwab Value Advantage Money Fund or Schwab Bank Savings Cash Account. Of course, had Plan participants been offered the option to invest in a stable value fund or guaranteed interest account, not only would they have been able to keep pace with inflation, but they would have been able to obtain a return considerably above inflation over that period.

97.     It is also instructive to examine what funds other retirement plan sponsors unrelated to Defendants selected to replace the terminating Schwab Stable Value Fund.  Table 3, below, lists 38 of the most recognizable companies whose plans were among the largest that were invested in the Schwab Stable Value Fund at the end of 2011, and would likely have a more robust fiduciary process in the selection of investment funds.  Thirty-five of those selected a different stable value fund to replace the Schwab Stable Value Fund and only three selected the Schwab Value

Advantage Money Fund. The list of plan sponsors selecting a different stable value fund includes the AICPA, Delta Dental, Enpro, Sharp Electronics, Taylor Made and United Airlines. Also included in that list are some of the nation's largest and most prestigious law firms, including most notably, Defendants' Defense Counsel in this case, Proskauer Rose LLP.

**Table 3**

| Unaffiliated Plan | Replacement Fund for Schwab Stable Value Fund |
| --- | --- |
| American Institute Of Certified Public Accountants (AICPA) | Galliard Stable Value Fund |
| American National Bank | Morley Stable Value Fund |
| American Suzuki Motor Corporation, Inc. | Schwab Govt Money Fund |
| Ann Taylor, Inc. | Morley Stable Value Fund |
| Benjamin Moore & Co. | Morley Stable Value Fund |
| Bombardier Corporation | Schwab Value Advantage Money Fund |
| Cirrus Logic, Inc. | Galliard Stable Value Fund |
| Coty, Inc. | Schwab Value Advantage Money Fund |
| Covington & Burling, LLP | New York Life Insurance Company Guaranteed Account |
| Delta Dental Of California | Morley Stable Value Fund |

| Unaffiliated Plan | Replacement Fund for Schwab Stable Value Fund |
|---|---|
| Ebay Inc. | Wells Fargo Bank Stable Value Fund. |
| Enpro Industries, Inc. | Galliard Stable Value Fund |
| Foley & Lardner LLP | Morley Stable Value Fund |
| Freshfields Bruckhaus Deringer | Invesco National Trust Company |
| Interstate Battery System Of America, Inc. | Federated Capital Preservation Stable Value |
| Japan Airlines Co., Ltd | Galliard Stable Value Fund |
| King & Spalding LLP | Galliard Stable Value Fund |
| Latham & Watkins LLP | Morley Stable Value Fund |
| Maui Jim, Inc. | Morley Stable Value Fund |
| Morrison & Foerster LLP | Morley Stable Value Fund |
| National Association For Stock Car Auto Racing, Inc. (Nascar) | Morley Stable Value Fund |
| National Financial Partners Corp | Morley Stable Value Fund |

| Unaffiliated Plan | Replacement Fund for Schwab Stable Value Fund |
|---|---|
| | |
| National Instrument Corporation | Galliard Stable Value Fund |
| Nova Chemicals, Inc. | New York Life Insurance Company Guaranteed Account |
| Pennsylvania State Employment Credit Union | Schwab Value Advantage Money Fund |
| Proskauer Rose LLP | Wells Fargo Bank Stable Value. |
| Seyfarth Shaw, LLP | Morley Stable Value Fund |
| Sharp Electronics Corporation | Invesco National Trust Company Stable Value Fund |
| Spectrum Medical Group, P.A. | New York Life Insurance Company Guaranteed Account |
| Taylor Made Golf Company, Inc. | Morley Stable Value Fund |
| The Mohegan Tribe Of Indians Of Connecticut | Schwab Value Advantage Money Fund |
| The Western Union Company | Wells Fargo Bank Stable Value Fund |

| Unaffiliated Plan | Replacement Fund for Schwab Stable Value Fund |
|---|---|
| Tom James Company | Morley Stable Value Fund |
| United Airlines, Inc. (Continental Airlines) | Wilmington Trust Company Stable Value |
| Universal City Development Partners, Ltd | Galliard Stable Value Fund |
| Williams-Sonoma, Inc. | Galliard Stable Value Fund |
| Wilson Sporting Goods Co. | Galliard Stable Value Fund |
| Zelle Hofmann Voelbel & Mason LLP | Morley Stable Value Fund |

98.    A review of EBAC minutes and related background materials indicates that the Schwab Fiduciary Defendants made no meaningful investigation into the merits of including a higher yielding stable value fund, insurance company guaranteed account, or similar fund offered by another company t for purposes of replacing the Schwab Stable Value Fund, the Schwab Value Advantage Money Fund, or the Schwab Savings Account, when a fiduciary decision was being made with respect to those funds. The Schwab Fiduciary Defendants' obligation to undertake that investigation was magnified by the obviously low returns the Schwab products that were included among the Plan's investment options. Instead, on information and belief, the Schwab Fiduciary

Defendants included the, the Schwab Value Advantage Money Fund and the Schwab Savings Account in lieu of stable value funds or similar funds merely to transition to the Schwab Bank Savings Cash Account, without properly considering better performing stable value funds. Schwab Fiduciary Defendants therefore violated the duties of prudence and loyalty set forth in ERISA § 404(a)(1).

### 3.   *Interest Free Loan from Unallocated Plan Cash.*

99.    The Schwab Fiduciary Defendants also used unallocated Plan cash (the "Unallocated Plan Cash") from new contributions, other assets awaiting investment, and from pending distributions and rollovers for their own benefit.

100.    In particular, Defendant CSBank, as the Plan's Trustee, held the Unallocated Plan Cash in accounts in the Plan's name.

101.    The Schwab Fiduciary Defendants exercised their discretionary authority to give Defendant CSBank discretionary authority to invest the Unallocated Plan Cash and retain as compensation for its services any credit, interest or other earnings it achieved on its investments of the Unallocated Plan Cash.

102.    While the relevant agreements between Defendant CSBank and the Plan provided some limitations on Defendant CSBank's investment of the Unallocated Plan Cash, Defendant CSBank nevertheless had wide discretion over the investment of the Unallocated Plan Cash, and Defendant CSBank also had discretion to set or amend certain of the limitations those agreements placed on its investment of the Unallocated Plan Cash.

103.    Therefore, the Schwab Fiduciary Defendants used the Unallocated Plan Cash as an interest free loan to their affiliate, Defendant CSBank, which retained the proceeds for its own benefit and for the benefit of its corporate parent, Defendant CSC.

104.   On information and belief, Schwab Fiduciary Defendants made no meaningful investigation into whether using the Unallocated Plan Cash as an interest free loan to themselves in this way was in the best interests of the Plan or its participants, or whether the Plan's assets could have been used differently in a way that benefitted the Plan and its participants.

105.   Schwab does not publicize the amount of compensation Defendant CSBank receives from investing the Unallocated Plan Cash. On information and belief, the compensation Defendant CSBank received from investing the Unallocated Plan Cash is grossly excessive in relation to the services Defendant CSBank provides to the Plan. On information and belief, the Schwab Fiduciary Defendants made no meaningful investigation into whether the banking and trust services for which Defendant CSBank retains the investment proceeds from the Unallocated Plan Cash could have been obtained at a lower cost to the Plan and its participants, or indeed whether the Unallocated Plan could have been used to provide additional benefits to the Plan and its participants. Instead, on information and belief, the Schwab Fiduciary Defendants used the Plan assets – the Unallocated Plan Cash – as an interest free loan to Defendant CSBank for no other reason than to enrich the Schwab Entity Defendants at the expense of the Plan and its participants.

106.   The Schwab Fiduciary Defendants therefore violated the duties of prudence and loyalty set forth in ERISA § 404(a)(1).

107.   The Schwab Fiduciary Defendants' use of the Plan assets as an interest free loan to themselves also amounted to a prohibited transaction within the meaning of ERISA § 406(a) and (b).

   a.   Defendant CSC and Defendant CSBank are parties in interest with respect to the plan under ERISA § 3(14), and the use of the Plan's assets as an interest free loan in exchange for services to the Plan amounted to the "furnishing of goods, services,

or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

b.   Moreover, the Schwab Fiduciary Defendants' use of the Plan's assets as an interest free loan resulted from the Schwab Fiduciary Defendants "deal[ing] with the assets of the plan in [their] own interest or for [their] own account" in violation of ERISA § 406(b)(1), "act[ing] in any transaction involving the plan on behalf of a party … whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries" in violation of ERISA § 406(b)(2), and "receiv[ing] any consideration for [their] own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan" in violation of ERISA § 406(b)(3).

**4.   Defendants Illegally Profited from the Operation of the Plan**

108.   ERISA § 406(a)(1)(C) prohibits Defendants from providing services that are necessary for the establishment or administration of the Plan unless they meet the conditions set forth in ERISA § 408(b)(2) and related regulations under 29 CFR 2550.408b-2(1)(c), which require the service provider to disclose detailed information about all direct and indirect compensation expected to be received in connection with the services, and which prohibit the service provider from receiving more than reasonable compensation.

109.   ERISA § 408(c)(2), and related regulations and Department of Labor rulings, contain a special rule for determining whether compensation is reasonable in a situation where the plan fiduciary selects itself or an affiliate to provide services to the plan.  408(b)(2) of ERISA does not contain an exemption for an act of self-dealing described in section 406(b), such as dealing

with the assets of the plan in his own interest or for his own account, even if such act occurs in connection with a provision of services that is exempt under section 408(b)(2).

110.    If a fiduciary provides services to a plan without the receipt of compensation or other consideration other than the reimbursement of direct expenses properly and actually incurred in the performance of such services, the provision of such services does not, in and of itself, constitute an act described in section 406(b) of ERISA. Regulation Section 2550.408c-2(b)(3) provides that an expense is not a direct expense to the extent that it would have been sustained had the service not been provided or if it represents an allocable portion of overhead; the so-called "but-for" rule.

111.    The application of this special rule to the Schwab Plan is explicitly recognized by the Revenue and Expense Analyses prepared annually by or for the EBAC.

112.    The special rule applies to both the reasonable compensation rule set forth in ERISA § 408(b)(2) that Defendants must satisfy in order to provide recordkeeping and administrative services to the Plan, as well as the condition of ERISA § 408(b)(8) with respect to compensation received by Defendants for the management of the Schwab affiliated collective investment trusts, including the Schwab Managed Retirement Trusts.

113.    A review of the Revenue and Expense Analyses prepared by or on behalf of the EBAC indicate that Defendants are receiving compensation that substantially exceeds Defendants' direct expense properly and actually incurred.

114.    On information and belief, Defendants did not accurately calculate the direct expense properly and actually incurred; meaning the expense it would not have incurred but for the services being provided to the Plan.  Schwab maintained the Schwab Managed Retirement Trusts as an investment product offered to its hundreds of other retirement plan customers. Therefore, Defendants must demonstrate the additional expense the collective investment trusts

incurred as a result of the Plan's participation in those funds.  If the expenses would have been incurred whether or not the Schwab Pan invested in those funds, then the expenses were not properly reimbursable because the funds were being operated and maintained for the benefit of Defendants' other retirement plan customers,.

115.  ███████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████  which, on information and belief, significantly exceeded Defendants' direct expense properly and actually incurred, since the expenses of operating the Schwab Managed Retirement Trusts would have been incurred whether or not the Plan invested in those funds.

116.  Since the Defendants received more than reasonable compensation with respect to the Schwab Managed Retirement Trusts, the exemption provided by ERISA § 408(b)(8) is not available, and the Defendants have caused the Plan to engage in a prohibited transaction in violation of ERISA § 406(a) and 406(b)(1).

117.  Defendants have relied on the exemption provided by Prohibited Transaction Class Exemption 77-3, which permits a plan sponsor to select its affiliated mutual funds as investment options in its retirement plan.  A condition of that exemption is that the plan must not pay a sales commission on the acquisition or redemption of the mutual fund shares.  The Department of Labor has made it clear that that the payment of a 12b-1 Fee by a mutual fund to a plan fiduciary or its affiliate could not be "functionally distinguished" in many instances from the payment of a commission by the plan in connection with the acquisition or sale of shares in a mutual fund.

118.  ███████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ Having failed to meet the condition of the required exemption, Defendants have caused the Plan to engage in prohibited transactions in violation of ERISA § 406(a)(1)(A).

119.   Furthermore, all of this compensation received from the Plan's investment in the collective investment trusts, the affiliated mutual funds, uninvested cash, revenue sharing from investments through the Personal Choice Retirement Account self-directed brokerage accounts, and other direct compensation or indirect compensation, must be taken into account in determining whether or not Defendants have received compensation for services that exceeds reimbursement of Defendants' direct expense properly and actually incurred in the performance of those services.. 86.

120.   The EBAC failed in its duty of diligence regarding Plan payments to Defendants with respect to Plan investments in Schwab-affiliated mutual funds and collective trusts. ███

████████████████████████████████████████████████████

████████████████████████████████████████ In fact, as the EBAC should have been aware from quarterly Defined Contribution Evaluation Performance Evaluations, the revenue sharing was materially in excess of those amounts.

## V. CLASS ALLEGATIONS

121.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all participants in and beneficiaries of the Plan at any time within six years of the filing of this Complaint. The period beginning six years preceding the

filing of the Complaint up until the time of a final judgment in this action are referred to herein as the "Class Period."

122.    Excluded from the class are the following persons: (a) any of the Defendants, (b) any fiduciaries of the Plans; (c) any of Defendants' officers or directors; (d) any member of the immediate family of and any heirs, successors or assigns of any such excluded party.

A.    **Numerosity and Impracticability of Joinder**

123.    Joinder of all members of the class would be impracticable based on the size of the class. Based on the Form 5500 filed with the Department of Labor for 2015, the Plan had more than 18,000 participants and/or beneficiaries. Thus the number of Class members is so large that joinder of all its members is impracticable.

B.    **Commonality**

124.    Plaintiff's claims raise common questions of law and fact with the class including:

   a.    Whether Defendants violated their ERISA fiduciary duties of prudence and loyalty by including Defendants' affiliated investment products as investment options for the Plan;

   b.    Whether Defendants engaged in transactions prohibited by ERISA by including Defendants' Affiliated investment products as investment options for the Plan;

   c.    Whether the Plan and its participants suffered losses as a result of Defendants' fiduciary breaches and/or prohibited transactions; and

   d.    Whether Defendants are liable to the Plan for restitution or constructive trust with respect to fees transferred to the Defendants or for disgorgement or reimbursement of excessive fees received by or profits generated for the Defendants as a result of the fiduciary breaches and/or prohibited transactions described herein.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## C.     Typicality

125.   Plaintiff's claims are typical of the claims of the class because their claims arise from the same events, practices and/or course of conduct as other members of the class. Plaintiff's claims challenge whether the Plan's fiduciaries acted consistently with their fiduciary duties and whether their breaches caused losses or otherwise harmed the Plan and its participants. Additionally, the prohibited transfer of plan assets to Defendants, or the payment to the Defendants of excessive and unreasonable compensation, occurred at the fund level and form a consistent basis of the claims of all Plan participants. These are claims common to and typical of other Class members. Moreover, these claims seek recovery on behalf of the Plan.

## D.     Adequacy

126.   Plaintiff will fairly and adequately protect the interests of the class.

127.   Defendants do not have any unique defenses against Plaintiff that would interfere with their representation of the class.

128.   Plaintiff has engaged counsel with extensive experience prosecuting class actions in general and ERISA class actions in particular.

## E.     Rule 23(b)(1)

129.   The requirements of Rule 23(b)(1)(A) are satisfied in this case. Fiduciaries of ERISA covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to uniformly act in the best interests of the Plan and its participants. As this action challenges whether Defendants acted consistently with their fiduciary duties to the Plan, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the fiduciaries of the Plan.

130.   The requirements of Rule 23(b)(1)(B) are satisfied in this case. Administration of an ERISA plan requires that all similarly situated participants be treated consistently. As such, whether Defendants fulfilled their fiduciary obligations with respect to the Plan and its participants in this action would, as a practical matter, be dispositive of the interests of the other members of the Class regardless of whether they are parties to the adjudication.

**F.    Rule 23(b)(2)**

131.   The requirements of Rule 23(b)(2) are met in this action. Defendants have applied the same or substantially similar investment policies and investment options in the Plan that cover all members of the Class. The fiduciary breaches, co-fiduciary breaches, and prohibited transactions alleged against Defendants with respect to the Schwab Affiliated Products and Services relate to policies that applied to, respectively, all members of the Class. As such, Defendants have acted or refused to act on grounds generally applicable to the Class as a whole.

132.   The primary relief sought on behalf of the Class is a determination that Defendants breached their fiduciary duties and engaged in prohibited transactions, a determination of the amount by which those breaches adversely affected the Plan rather than individual members of the Class, and a consequent order requiring Defendants to make good those losses to the Plan. Such relief is accomplished by issuance of a declaration or an injunction and therefore the primary requested relief constitutes final injunctive or declaratory on behalf the Class with respect to the Plan.

**G.    Rule 23(b)(3)**

133.   The requirements of Rule 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants breached their fiduciary duties to the Plan. Similarly, as relief will be on behalf of and will flow to the Plan, common questions related to remedies and

relief will likewise predominate over individual issues.

134.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The losses suffered by many of the individual members of the Class are likely small, particularly in relation to the cost to bring this litigation and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights. The fiduciaries of the Plan have an obligation to treat all similarly situated participants similarly and are subject to uniform standards of conduct under ERISA; thus the members of the Class have an interest in having this action proceed in a single action. As such, no Class member has an interest in individually controlling the prosecution of this matter.

## VI. CLAIMS FOR RELIEF

### Count I

### Breach of Fiduciary Duty (ERISA § 404)
### (The Schwab Fiduciary Defendants)

135.   Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

136.   The Schwab Fiduciary Defendants were ERISA fiduciaries for the Plan pursuant to ERISA §§ 402(a) and/or 3(21) subject to ERISA's fiduciary duties of prudence and loyalty. ERISA § 404(a)(1)(A)-(B).

137.   As alleged above, the Schwab Fiduciary Defendants violated the duties of prudence and loyalty imposed by ERISA § 404(a)(1)(A)-(B) by, among other things:

    a.   Failing to adequately consider and evaluate unaffiliated stable value funds, insurance company guaranteed accout or similar capital preservation options as a replacement for the terminating Schwab Stable Value Fund;

    b.   Failing to adequately consider and evaluate unaffiliated stable value funds,

insurance company guaranteed accout or similar capital preservation options as a replacement for the Short Duration Bond Strategy and Schwab Value Advantage Money Fund when those funds were being eliminated;

c.  Retaining the Schwab Managed Retirement Trusts despite extended consecutive periods of underperformance and high fees compared to other unaffiliated and readily available alternative target date funds;

d.  Selecting the Schwab Bank Savings Cash Account as the capital preservation option for the Schwab Index Advantage investment option;

e.  Failing to ensure that the Schwab Bank Savings Cash Account paid participants a reasonable rate of interest, taking into account the amount CSBank was earning with respect to its investment of Plan assets held in the Account ;

f.  Receiving direct and indirect compensation with respect to the performance of services for the Plan that exceeded Defendants direct expense actually and properly incurred; and

g.  Retaining the Schwab Managed Retirement Trusts  and Schwab Bank Savings Cash Account as investment options within the Plan for the purpose of benefitting the Schwab Entity Defendants.

138.   The Schwab Fiduciary Defendants' fiduciary breaches proximately caused losses to the Plan in an amount to be determined at trial.

139.   The Schwab Fiduciary Defendants are liable to make good those losses to the Plan and for all other available remedies under ERISA §§ 409 and 502(a)(3).

1
2
3

**Count II**

**Prohibited Transactions (ERISA § 406(a) & (b))**
**(The Schwab Fiduciary Defendants)**

4
5

140.   Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

6
7
8
9

141.   As alleged above, the Schwab Fiduciary Defendants were ERISA fiduciaries for the Plan pursuant to ERISA §§ 402(a) and/or 3(21) subject to ERISA's fiduciary duties of prudence and loyalty. ERISA § 404(a)(1)(A)-(B).

10
11
12
13

142.   ERISA § 406(a) prohibits ERISA fiduciaries from causing ERISA plans to engage in certain enumerated transactions with parties in interest, and ERISA § 406(b) prohibits ERISA fiduciaries from causing ERISA plans to engage in certain enumerated transactions with plan fiduciaries.

14
15
16
17
18
19

143.   As alleged above, the Schwab Fiduciary Defendants caused the Plan to engage in transaction with parties in interest with respect to the Plan and/or with Plan fiduciaries in violation of ERISA § 406(a)(1)(C) by retaining Schwab affiliates to perform recordkeeping and administrative services for the Plan and failing to ensure that the compensation paid for those services did not exceed the limitations set forth in ERISA § 408(c).

20
21
22
23
24
25

144.   The Schwab Fiduciary Defendants caused the Plan to engage in transactions with parties in interest with respect to the Plan and/or with Plan fiduciaries in violation of ERISA § 406(a)(1)(A) by purchasing and redeeming shares of registered investment companies affiliated with the Schwab Fiduciary Defendants and failing to ensure that no commission was paid with respect to the purchase and redemption of those registered investment company shares.

26
27

145.   The Schwab Fiduciary Defendants caused the Plan to engage in transaction with parties in interest with respect to the Plan and/or with Plan fiduciaries in violation of ERISA §

28

406(a)(1)(A) by acquiring interests in collective investment trusts for which CSBank served as trustsee and failing to ensure that CSBank received no more than reasonable compensation in excess of the limitations set forth in ERISA § 408(c).

146.   The Schwab Fiduciary Defendants caused the Plan to engage in transactions with parties in interest with respect to the Plan and/or with Plan fiduciaries in violation of ERISA § 406(a)(1)(B), (C) and (D) by investing in a demand deposit account with CSBank and failng to ensure that participants received a reasonable rate of interest as required by ERISA § 408(b)(4).

147.   The Schwab Fiduciary Defendants' prohibited transactions proximately caused losses to the Plan in an amount to be determined at trial.

148.   The Schwab Fiduciary Defendants are liable to make good those losses to the Plan and for all other available remedies under ERISA §§ 409 and 502(a)(3).

### Count III

### Breach of Fiduciary Duty (ERISA § 404)
### (The Board of Director Defendants)

149.   Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

150.   The Board of Director Defendants were ERISA fiduciaries for the Plan pursuant to ERISA § 3(21) by virtue of their authority to appoint members of the Committee, and were, as such, subject to ERISA's fiduciary duties of prudence and loyalty in appointing members of the Committee. ERISA § 404(a)(1)(A)-(B). In addition, ERISA fiduciaries with discretionary authority to appoint other fiduciaries have a fiduciary responsibility to monitor and evaluate the performance of those they appoint on an ongoing bases, and to take action, including removal of the appointees, to remedy any failure by the appointees to adequately fulfill their fiduciary obligations.

151.   The Board of Director Defendants violated the duties of prudence and loyalty imposed by ERISA § 404(a)(1)(A)-(B) by, amongst other things:

    a.   Failing to appropriately investigate and monitor whether Schwab Fiduciary Defendants were prudently fulfilling their fiduciary role by selecting the Schwab Affiliated Products and Services as investment options within the Plan;

    b.   Failing to appropriately investigate and monitor whether Schwab Fiduciary Defendants were loyally fulfilling their fiduciary role by selecting the Schwab Affiliated Products and Services as investment options within the Plan; and by

    c.   Failing to take action to correct the Schwab Fiduciary Defendants imprudence and disloyalty in selecting the Schwab Affiliated Products and Services as investment options within the Plan.

152.   The Board of Director Defendants' fiduciary breaches proximately caused losses to the Plan in an amount to be determined at trial.

153.   The Board of Director Defendants are liable to make good those losses to the Plan and for all other available remedies under ERISA §§ 409 and 502(a)(3).

## Count IV

### Breach of Co-Fiduciary Duty (ERISA § 405)
### (The Schwab Fiduciary Defendants)

154.   Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

155.   As alleged above, the Schwab Fiduciary Defendants were ERISA fiduciaries for the Plan.

156.   ERISA § 405 renders ERISA fiduciaries liable for other fiduciaries' misconduct under certain circumstances.

157.   In addition to their liability for their own fiduciary breaches described above, the Schwab Fiduciary Defendants are liable for the breaches of the Plan's other fiduciaries under ERISA § 405 because they:

    a.   Knowing participated in the acts and omissions constituting those breaches despite knowing that those acts or omissions amounted to breaches of fiduciary duty;

    b.   Failed to comply with the duties of prudence and loyalty in ERISA § 404(a)(1) in the administration of their own responsibilities, thereby enabling the breaches of the other fiduciaries; and

    c.   Had knowledge of the breaches by the other fiduciaries but undertook no reasonable efforts under the circumstances to remedy the breaches.

158.   The Schwab Fiduciary Defendants co-fiduciary breaches proximately caused losses to the Plan in an amount to be determined at trial.

159.   The Schwab Fiduciary Defendants are liable to make good those losses to the Plan and for all other available remedies under ERISA §§ 409 and 502(a)(3).

## Count V

### Knowing Participation in and/or Benefit from Fiduciary Breaches and Prohibited Transactions (ERISA 502(a)(3)) (Schwab Entity Defendants)

160.   Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

161.   As alleged above, the Schwab Entity Defendants were the direct or indirect beneficiaries of the fiduciary breaches, prohibited transactions and co-fiduciary breaches alleged above.

162.   Moreover, in many cases the Schwab Entity Defendants participated in and/or

facilitated the fiduciary breaches, prohibited transactions and co-fiduciary breaches alleged above.

163.   The Schwab Entity Defendants knew of the existence of the Plan, and had actual and/or constructive knowledge of the circumstances that rendered the acts and omissions of the Schwab Fiduciary Defendants' fiduciary breaches, co-fiduciary breaches and/or prohibited transactions unlawful.

164.   ERISA § 502(a)(3) permits ERISA plan participants to seek injunctive and other appropriate equitable relief against anyone who knowingly participants in or benefits from violations of ERISA.

165.   The Schwab Entity Defendants should be enjoined from further knowing participation in or benefitting from the violations of ERISA alleged above.

166.   In addition, the Schwab Entity Defendants must restore to the Plan all property they hold as a result of the Schwab Fiduciary Defendants' fiduciary breaches, co-fiduciary breaches and/or prohibited transactions that in good conscience belongs to the Plan, must disgorge to the Plan the proceeds of such property to the extent it has been disposed of, and must disgorge any profits they received as a result of holding such property.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.   Enter an order declaring that the Schwab Fiduciary Defendants breached their fiduciary and co-fiduciary duties under ERISA and engaged in prohibited transactions as alleged herein;

B.   Enter an order enjoining the Schwab Fiduciary Defendants from further breaches of their fiduciary and co-fiduciary duties under ERISA and from further prohibited transactions;

C.  Enter an order requiring the Schwab Fiduciary Defendants to make good to the Plan the losses their fiduciary breaches, co-fiduciary breaches and/or prohibited transactions caused the Plan pursuant to ERISA § 409;

D.  Enter an order enjoining the Schwab Entity Defendants from further knowing participation in and receipt of benefit from the Schwab Fiduciary Defendants' breaches of their fiduciary and co-fiduciary duties under ERISA and prohibited transactions;

E.  Enter an order requiring the Schwab Entity Defendants to disgorge to the Plan (a) any and all property they hold as a result of the Schwab Fiduciary Defendants' and fiduciary breaches, co-fiduciary breaches and/or prohibited transactions that in good conscience belongs to the Plan, (b) the proceeds of such property to the extent it has been disposed of, and (c) any profits they received as a result of holding such property;

F.  Enter an order requiring the Schwab Fiduciary Defendants to provide a full accounting of all fees paid, directly or indirectly, by the Plan to the Defendants;

G.  Awarding Plaintiff and the Class their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), the common benefit doctrine and/or the common fund doctrine;

H.  Awarding pre-judgment and post-judgment interest; and

I.  Awarding such other remedial or equitable relief as the Court deems appropriate.

Date: October 18, 2018                    Respectfully Submitted,

                                          /s/ John J. Nestico
                                          Garrett W. Wotkyns (Admitted *Pro Hac Vice*)
                                          John J. Nestico (Admitted *Pro Hac Vice*)
                                          SCHNEIDER WALLACE COTTRELL
                                          KONECKY WOTKYNS LLP
                                          8501 North Scottsdale Road, Suite 270
                                          Scottsdale, Arizona 85253
                                          Telephone: (480) 428-0141

Facsimile: (866) 505-5036
gwotkyns@schneiderwallace.com
jnestico@schneiderwallace.com

James A. Bloom (SBN 311051)
Todd M. Schneider (SBN 158253)
James A. Bloom (SBN 311051)
Kyle G. Bates (SBN 299114)
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
jbloom@schneiderwallace.com
kbates@schneiderwallace.com

Todd S. Collins (Admitted *Pro Hac Vice*)
Shanon J. Carson (Admitted *Pro Hac Vice*)
Ellen T. Noteware (Admitted *Pro Hac Vice*)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
tcollins@bm.net
scarson@bm.net
enoteware@bm.net

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2018, I electronically filed the foregoing document with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

*/s/John J. Nestico*
John J. Nestico